MARINA MANAGEMENT CORP.,
Plaintiff-Appellant,

v.

John D. BREWER, Jr.,
Defendant-Appellee.

No. 236, Docket 77-7322.

United States Court of Appeals,
Second Circuit.

Argued Oct. 26, 1977.

Decided March 2, 1978.

James V. Joy, Jr., New York City, for plaintiff-appellant.

Harvey J. Rothberg, Stamford, Conn., for defendant-appellee.

Before FRIENDLY, GURFEIN and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

This diversity action was commenced by plaintiff-appellant Marina Management Corp. ("Management") in the United States District Court for the District of Connecticut to recover a brokerage commission arising out of an aborted sale of a Connecticut marina. Judge Jon O. Newman granted a motion for summary judgment in favor of defendant-appellee John D. Brewer, Jr., on the ground that Management was not a licensed real estate broker as required by Connecticut Law. Conn.Gen.Stat. §§ 20–311(a) and (c), 312, 325a(a). Final judgment has been entered pursuant to Fed.R.Civ.P. 54(b). We affirm.

Management is a New York corporation engaged in the business of brokering the purchase and sale of boatyards and marinas. It is licensed to do business in Connecticut, but it is not licensed as a Connecticut real estate broker. In late 1973, Management contracted with Stratford Marina, Inc. ("Marina") of Stratford, Connecticut, to appraise the "physical assets" of Marina. This appraisal was to be of "all of the physical assets of the marina including land, buildings, docks, piers, floats, electrical, water, sanitary, blacktop, dredging, etc.," as well as yard and shop tools and office and showroom equipment and installations. On December 19, 1973, Management submitted an appraisal of $1,322,000. On January 30, 1974, after discussions between Management and R. O. Palmer, owner of Marina, regarding the value of the real estate and Marina's main building, this appraisal was adjusted to $1,496,000. On February 11, 1974, Management and Marina executed a listing agreement giving Management the exclusive right to offer one-half of the marina at Stratford for sale at $850,000 and authorizing Management to negotiate the leasing of the other half. The agreement stated that the sale price was for a portion of the assets of Marina previously appraised by Management. Marina agreed to pay Management a brokerage commission of ten percent of the total sales price.

In March, 1974, Management contacted defendant-appellee Brewer, a Connecticut resident who had previously purchased marinas through Management. Brewer made two offers to purchase one-half of Marina's physical assets, but Marina rejected them. A third offer was acceptable to Marina, however, and a purchase agreement was drafted in early 1975. At one point, the proposed contract referred to the "good will" and trade name of Stratford Marina, but these references were deleted when Brewer insisted that he was purchasing the physical assets and not the corporation. In April, 1975, negotiations between Marina and Brewer broke down, and Marina instructed Management "to cease any further negotiations with Mr. Brewer." Marina also terminated its exclusive listing agreement with Management, leaving Management with only a verbal understanding that it could, on a non-exclusive basis, negotiate the sale of the marina.

Eventually, Marina decided to offer the entire marina for sale for $1,500,000. Despite Marina's instructions, Management had continued to negotiate with Brewer regarding the Marina listing and, in September, 1975, forwarded Brewer's offer to pay $1,200,000. As with the other offers by Brewer, however, negotiations broke down and the sale never took place.

At the heart of the instant dispute are Management's allegations that on or about March 15, 1974, Brewer agreed to assume the obligations of Marina with regard to Management's brokerage commission and that, at some point during the negotiations, Marina actually accepted Brewer's last offer. Thus, Management argues that Brewer owes $120,000 in brokerage fees; in the alternative, it argues that it is entitled to $100,000 on the theory of quantum meruit. The district court granted summary judgment in favor of Brewer based on his argument that Management was barred, under Conn.Gen.Stat. § 20–325a(a), from recovering a commission on the attempted sale of the marina because it did not have a Connecticut real estate broker's license as required by Conn.Gen.Stat. § 20–312.[1] We affirm the judgment of the district court.

The responsibility of the federal courts in a diversity action is to determine and apply the law of the state in which the federal trial court sits. *Erie R. R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Unfortunately, the Connecticut courts have not determined whether or in what circumstances a broker who negotiates or attempts to negotiate the transfer of a business' physical assets is a "real estate broker" for purposes of § 20–311(a).[2]

1. Brewer also defended by arguing that he had not agreed to assume Marina's commission obligations and that, in any event, Management's commission was contingent upon the parties reaching a final agreement. The district court found that resolution of these matters turned on disputed facts, and so correctly declined to use them as grounds for summary judgment.

2. The Connecticut court's decision in *United Interchange, Inc. v. Spellacy*, 144 Conn. 647, 136 A.2d 801 (1957), does not answer the question presented here. There, United Interchange, a New York corporation not licensed to do business in Connecticut, successfully challenged as unconstitutional a 1955 amendment to the real estate broker licensing statutes that included its business within the definitions of "real estate broker" and "engaging in the real estate business." Rather than being a broker, however, United was a publisher. Its business consisted of soliciting the names of businesses and property owners who were interested in selling, leasing, or making an exchange of their business enterprises or properties, and,

for a price, listing them in periodicals called "Buyer's Digest" and "Broker's Bulletin." These periodicals were in turn distributed free of charge to chambers of commerce, public libraries and various real estate and business opportunity brokers. The court determined that the inclusion of United's business in the statutory definitions violated the due process and equal protection provisions of the federal and state constitutions. It based its decision on the nature of United's business:

United's business is primarily advertising. . . . It does not appear . . . that [United's] salesmen advise as to price and for that reason should have some knowledge of real estate values, nor that they direct or assist in the negotiations between the interested parties and so must know something about real estate incumbrances, taxes, zoning and other regulations, and other similar factors involved in a real estate deal. . . . The terms of payment prescribed by United are such that its salesmen have no occasion to handle its customers' funds.

The silence of Connecticut's courts, however, neither releases us from our responsibility nor lightens our burden. *See Meredith v. Winter Haven*, 320 U.S. 228, 234, 64 S.Ct. 7, 88 L.Ed. 9 (1943). In such circumstances, we must "do the best we can in estimating 'what the state court would rule to be its law.'" *Holt v. Seversky Electronatom Corp.*, 452 F.2d 31, 34 (2d Cir. 1971), *quoting Bernhardt v. Polygraphic Co. of America, Inc.*, 350 U.S. 198, 209, 76 S.Ct. 273, 100 L.Ed. 199 (1956) (Frankfurter, *J.*, concurring); *see Storke v. St. Johnsbury Trucking Co.*, 443 F.2d 89, 91 (2d Cir. 1971); *Locke Manufacturing Cos. v. United States*, 237 F.Supp. 80, 85–86 n.8 (D.Conn.1964) (Timbers, *J.*). Here, we are unaware of any State procedure by which we could certify this question to the Connecticut courts, *compare* Fla.Stat.Ann. § 25.031 and Fla. App.R. 4.61, and the determination of Connecticut law is not sufficiently difficult to warrant remitting the parties to those courts. *See Lehman Brothers v. Schein*, 416 U.S. 386, 390–91, 94 S.Ct. 1741, 40 L.Ed.2d 215 (1974), *vacating Schein v. Chasen*, 478 F.2d 817 (2d Cir. 1973), *after remand*, 519 F.2d 453 (2d Cir. 1975); *Meredith v. Winter Haven, supra*, 320 U.S. at 234, 64 S.Ct. 7; *cf.* Comment, The State Advisory Opinion Perspective, 44 Fordham L.Rev. 81, n.3 (1975).

■ Brewer's statutory defense is based primarily upon Conn.Gen.Stat. § 20–325a(a), which provides as follows:

ACTIONS TO RECOVER COMMISSIONS ARISING OUT OF REAL ESTATE TRANSACTIONS

(a) No person who is not licensed under the provisions of this chapter, and who was not so licensed at the time he performed the acts or rendered the services for which recovery is sought, shall commence or bring any action in any court of this state . . . to recover any commission, compensation or other payment in respect of any act done or service rendered by him, the doing or rendering of which is prohibited under the provisions of this chapter except by persons duly licensed under this chapter.

There is no question that Management did not have a Connecticut real estate broker's license when it attempted to initiate and then consummate the sale of the marina to Brewer. Nor is there any question that Management was acting as a "broker" when it performed these functions—Management itself characterizes its business as that of a "business broker" or "marina broker." The real question, then, is whether Management was acting as a *real estate* broker for purposes of the Connecticut statute. We hold that it was and that, accordingly, Management was properly barred as a matter of law from recovering brokerage commissions stemming from its involvement in the aborted sale of the marina to Brewer.

The district court determined that "[t]he inference that [Management] rendered real estate brokerage services to Marina is irresistible." Prior to the execution of the listing agreement, Management was retained to appraise the "physical assets" of Marina, the "land, buildings, docks, piers, floats, electrical, water, sanitary, blacktop, dredging, etc." The initial appraisal was raised almost $175,000 after discussion regarding the value of the real estate and the main building. The record shows that the final $1,500,000 asking price was determined by reference to the $1,496,000 appraisal, as was the $1,200,000 offer by Brewer. The deposition of Robert Wheeler, Management's secretary and treasurer, indicates clearly that the appraisal was of Marina's physical assets and not its value as a business. He noted specifically that Management employs an entirely different procedure for the appraisal of marinas as going businesses, a procedure he characterized as the "income approach." The record shows that Management made no effort to appraise the business value of Marina in anticipation of the sale; both the initial and final apprais-

144 Conn. at 655-56, 136 A.2d at 805. The inference to be drawn from this decision, of course, is that a company providing services similar to those provided by Management would be denominated a "real estate broker" for purposes of Conn.Gen.Stat. § 20–311(a).

als submitted by Management to Marina included the notation that "[e]arnings have not been capitalized to use as a check on our value determination." In addition, the deposition of R. O. Palmer, owner of Marina, makes it clear that Brewer was going to receive the deed to the land and buildings rather than stock in the corporation and that Palmer did not consider offering stock to Brewer. Responding to the question whether he thought he was selling Brewer a business, Palmer said that he was selling "assets and that [Brewer] would have the right to run a business there." Finally, Brewer specifically requested that the sales agreement include no reference to Marina's trade name or "good will," asserting that he had "no interest" in such items. Thus, the nature of the sale was plain not only to Marina and Brewer, but to Management as well. That Management had previously brokered sales of marinas both as businesses and physical entities makes the nature of the understanding among the parties all the more obvious.

Given this, we think that a Connecticut court would bar recovery by Management. Connecticut's real estate broker licensing scheme, Conn.Gen.Stat. § 20–311 *et seq.*, is based on the notion that "[a] real estate broker or salesman occupies a position of superiority and influence which invites the trust and confidence of those who deal with him. He is often entrusted with substantial sums of his client's money." *Cyphers v. Allyn*, 142 Conn. 699, 706, 118 A.2d 318, 322 (1955). The license requirements "furnish supervision and regulation of the real estate business and make possible the elimination of the incompetent and unscrupulous agent." *Id.* at 704, 118 A.2d at 321. The Connecticut court has held that the statute is "remedial in nature and for that reason is to be liberally construed in order to accomplish its purpose." *Metropolitan Casualty Co. v. Billings*, 150 Conn. 603, 608, 192 A.2d 541, 544 (1963).

■ Conn.Gen.Stat. § 20–311(a) defines "real estate broker" to include "any . . . corporation which, for another and for a fee . . . lists for sale, sells, exchanges, buys or rents, or offers or attempts to negotiate a sale, exchange, purchase or rental of, an estate or interest in real estate. . . ." The definition of "engaging in the real estate business" contains a parallel provision. Conn.Gen.Stat. § 20–311(c). The statute prohibits acting as a real estate broker without a license, bars recovery or compensation to those who do so, and exposes them to criminal penalties. Conn.Gen.Stat. §§ 20–312, 325a, 325. The list of exceptions to the statutory requirements makes no mention of "business brokers" or "marina brokers." Conn.Gen.Stat. § 20–329. Finally, during its consideration of these statutory provisions, the Connecticut legislature was aware of the practice of brokering the purchase and sale of commercial and industrial properties. *See* 16 Conn.H.R.Proc., pt. 4, 1973 Sess., pp. 1518–19; Hearing before the Joint Standing Committee on Insurance and Real Estate, Conn.Gen. Assembly, 1971 Sess., pp. 229–32. We find no ambiguity in either the wording of the statute or the intent of the Connecticut legislature and we see no reason to think that a Connecticut court would, if presented with the issue, find differently. *See* Conn.Gen.Stat. § 1–1; *Colli v. Real Estate Commission*, 169 Conn. 445, 450, 364 A.2d 167, 171 (1975); *Metropolitan Casualty Co. v. Billings, supra*, 150 Conn. at 608, 192 A.2d at 544. It is, of course, well established in Connecticut that criminal statutes are to be strictly construed, but this canon of statutory construction does not prevent the application of common sense to the language so as to effectuate the evident intent of the lawmakers. *See State v. Pastet*, 169 Conn. 13, 21–22, 363 A.2d 41, 46 (1975); *State v. Sober*, 166 Conn. 81, 91, 347 A.2d 61, 67 (1974); *State v. Archambault*, 146 Conn. 605, 607–08, 153 A.2d 451, 452 (1959).

Despite this lack of ambiguity, Management seizes upon the fact that the Connecticut courts have not decided this issue and argues that if and when they do, they will decide according to the so-called "New York rule," under which unlicensed brokers may sometimes recover commissions for negotiating the transfer of going businesses even if a transfer of real estate is also involved.

Management claims that the negotiations around the Marina sale involved a "blend" of business and real estate brokerage services of the type covered by this rule. Brewer, on the other hand, argues that the Connecticut courts would adopt the "New Jersey rule," a rule somewhat stricter than New York's. The district court held that recovery would be barred under either rule, thus eliminating the need to choose between them. We agree.

For purposes of this decision, we need not, and do not, determine either New York or New Jersey law. While the "New York rule" itself is far from clear, it appears to be that a broker who lacks a real estate broker's license may under certain circumstances recover a brokerage commission for negotiating the transfer of a going business despite the fact that real estate forms an element of the transaction. *See* N.Y. Real Prop. Law §§ 440, 440–a, 442–d; *Weingast v. Rialto Pastry Shop, Inc.*, 243 N.Y. 113, 152 N.E. 693 (1926). New York courts have interpreted the statutes and the *Weingast* case to mean that an unlicensed broker may recover a commission when real estate is an "incidental," and sometimes even "significant," though not "dominant," feature of the transaction. A license is required, however, when real estate is the "dominant" feature. *See Myer v. Jova Brick Works, Inc.*, 38 A.D.2d 615, 617, 326 N.Y.S.2d 321, 324 (3rd Dep't 1971); *Sorice v. DuBois*, 25 A.D.2d 521, 267 N.Y.S.2d 227 (1st Dep't 1966); *Dodge v. Richmond*, 5 A.D.2d 593, 595, 173 N.Y.S.2d 786, 788 (1st Dep't 1958); *Baird v. Krancer*, 138 Misc. 360, 362, 246 N.Y.S. 85, 88 (Sup.Ct. N.Y. County 1930); *see also Backar v. Western States Producing Co.*, 547 F.2d 876, 883 n.11 (5th Cir. 1977) ("When real estate is not the dominant feature of the sale of a business, no real estate license is usually required under New York law."); *Flammia v. Mite Corp.*, 401 F.Supp. 1121, 1134 (E.D.N.Y.1975) (N.Y. Real Prop. Law § 442–d prohibits recovery of brokerage commissions when the purchaser of a business has real estate as the "chief object" of that purchase), *aff'd mem.*, 553 F.2d 93 (2d Cir. 1977).

The "New Jersey rule" may be stated in even briefer fashion: it appears to hold that a broker lacking a real estate broker's license may not recover a commission if the transaction involves *any* real estate. *See* N.J.Rev.Stat. §§ 45:15–1, 15–2, 15–3; *Kenney v. Paterson Milk & Cream Co.*, 110 N.J.L. 141, 164 A. 274 (1933).

Management's final appraisal of Marina's physical assets valued land at $394,500 and buildings at $590,487. In addition, other physical assets, permanently affixed to the marina, included four main docks and piers valued at $60,000, travel lift slots valued at $32,000, and bulkheads valued at $152,000. From this, we think that, even if § 20–325a(a) were interpreted to be the same as the so-called "New York rule," the Connecticut courts would bar Management's recovery. The real estate was neither "incidental" nor merely "significant" but was the "dominant" feature of the transaction.

We reject Management's other arguments, particularly the contention that Connecticut's statute, as here interpreted, unconstitutionally burdens interstate commerce by depriving marina brokers of a livelihood and businesses of necessary brokerage services. *See Complete Auto Transit Inc. v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977); *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970); *Goldsmith v. Walker Manufacturing Co.*, 295 F.Supp. 1037, 1040 (E.D.Wis.1969); Conn.Gen.Stat. § 20–317 (providing for the licensing of non-residents and the recognition by Connecticut of licenses granted to non-residents by other states).

Viewing the record in the light most favorable to Management, *see United States v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962), it is clear to us that the undisputed facts justified entry of summary judgment on the basis of Brewer's statutory defense. The judgment of the district court is affirmed.