A. Gary FIEGER, Plaintiff–Appellant,

v.

PITNEY BOWES CREDIT CORPORATION, Pitney Bowes Real Estate Financing Corporation and PREFCO XXII Limited Partnership, Defendants–Appellees.

No. 00–9050.

United States Court of Appeals, Second Circuit.

Argued Feb. 20, 2001.

Decided May 31, 2001.

Clarence S. Barasch (Lionel A. Barasch, of counsel), New York, NY, for Plaintiff–Appellant A. Gary Fieger.

John M. Callagy, Kelley Drye & Warren, New York, NY, for Defendants–Appellees Pitney Bowes Credit Corporation, Pitney Bowes Real Estate Financing Corporation and PREFCO XXII Limited Partnership.

Before MESKILL, PARKER, and KATZMANN, Circuit Judges.

KATZMANN, Circuit Judge:

Plaintiff–Appellant A. Gary Fieger ("Fieger" or "plaintiff") appeals from a judgment of the United States District Court for the Southern District of New York (Sidney H. Stein, *Judge* ), dismissing his contract and quantum meruit claims as barred by Connecticut's real estate broker licensing statute, Connecticut General Statute § 20–325a(a). Fieger contends that the district court erred in applying Connecticut law because under the applicable New York conflict-of-law principles, the court should have applied New York law, under which his claims are not barred. He also argues that even if Connecticut law applies, because he acted as a financial advisor rather than a real estate broker, Section 20–325a(a) does not bar his claims. For the reasons stated below, we affirm the judgment of the district court to the extent that it dismissed Fieger's contract claim against PREFCO XXII, but we vacate as to the contract claim against Pitney Bowes and PREFCO, and the quantum meruit claim, both of which should have been assessed under New York law. We remand to the district court for further proceedings consistent with this opinion.

## BACKGROUND

Fieger operates a financial advising business from his home office on the Upper East Side of Manhattan. Defendants–Appellees Pitney Bowes Credit Corporation ("Pitney Bowes"), and its directly or indirectly wholly owned subsidiaries, Pitney Bowes Real Estate Financing Corporation ("PREFCO") and PREFCO XXII Limited Partnership ("PREFCO XXII") (together, "defendants"), are real estate financing businesses with their principal places of business in Connecticut. Pitney Bowes has financed real estate development projects nationwide, including projects in California, Pennsylvania, Indiana, Georgia, Texas and Virginia.

In 1994, the Swiss Bank Corporation ("SBC") began to search for potential investors for its new American headquarters in Stamford, Connecticut, which was scheduled to be built by late 1997. In 1996, SBC sent a request for proposals ("RFP") to a few real estate investors to solicit their interest in financing the SBC headquarters. In the RFP, SBC stated that it wished to finance its headquarters through a sale-leaseback arrangement, and was seeking an investor to purchase the partially completed office building and trading pavilion, and to lease the facility back to SBC. Pitney Bowes responded to the RFP, but SBC did not act on that response.

Fieger claims that in 1995, SBC officials and Fieger's Swiss business associate, Karl Steiner Holding Corporation ("Steiner"), informed him about the Stamford project. In late 1995, SBC officials in New York advised Fieger that SBC had decided to structure the deal as a sale and leaseback. In September 1996, Fieger received a copy of SBC's RFP. In late 1996, he met with representatives of Union Bank of Switzerland ("UBS") in New York to discuss potential joint real estate financing· opportunities, including the proposal for the SBC

headquarters. In pursuing this possibility, Fieger communicated with UBS at its New York offices and with SBC officials in Switzerland and New York.

Soon thereafter, UBS in New York proposed to Pitney Bowes in Connecticut that Pitney Bowes become involved with a large financing project, but did not reveal to Pitney Bowes the location of the property as Stamford or the identity of its owner as SBC. In a letter dated April 11, 1997, UBS informed Pitney Bowes that the property was located in Stamford and owned by SBC. UBS told Pitney Bowes that it was working with someone-Fieger-who had an inside connection at SBC and who might be able to help Pitney Bowes negotiate the transaction without competition. Pitney Bowes was attracted to the possibility of a preemptive deal. UBS requested that Pitney Bowes prepare a term sheet for financing a private transaction between Pitney Bowes and SBC. On April 14th, Fieger faxed the Swiss Bank RFP to UBS. On April 23rd, Pitney Bowes sent UBS the financing proposal for the Stamford project. The next day, UBS sent Fieger a letter in which it stated:

> Nevertheless, we also understand that in the event a financing is consummated involving, among others, Pitney and Swiss Bank or their respective affiliates, UBS will be paid on the closing date an advisory/arranging fee of 1% of so-called "PREFCO Cost" out of the financing. (For your information, this advisory/arranging fee has already been included among the items intended to be paid out of the 2% Transaction Fee assumed by Pitney in the attached financing proposal.)

On April 29th, UBS sent Fieger a similar letter, along with the Pitney Bowes financial proposal which Fieger was to submit to the appropriate persons at SBC. The letter included slightly different terms with regard to the advising fee:

> Nevertheless, we also understand that in the event a financing is consummated involving, among others, Pitney and Swiss Bank or their respective affiliates, UBS will be paid on the closing date an [sic] placement/arranging fee of .75% of the so-called 'PREFCO Cost' out of the financing. (For your information, this advisory/arranging fee as well as the Fieger Associates Inc. advisory fee not to exceed .75% have already been included among the items intended to be paid out of the 2.5% Transaction Fee assumed by Pitney in the attached financing proposal.)

Pitney Bowes claims that it never discussed the payment of fees with Fieger, nor did it see the April 29th UBS letter until after the present lawsuit had been commenced.

On April 29, 1997, PREFCO mailed to Fieger's New York office a copy of the Pitney Bowes term sheet for the proposed transaction. This letter stated that "[i]ncluded in our pricing is fees and expenses of 2.5%." The term sheet was set to expire by its terms on May 15, 1997, and stated that it was "not a commitment by PREFCO to enter into this transaction, nor should it be construed as an offer to perform any undertaking." The next day, Fieger forwarded the Pitney Bowes proposal to SBC at its New York office. On May 6th, Pitney Bowes sent a letter to SBC stating: "This letter will confirm that PREFCO and its advisors are aware of [the April 29th] submission and that Mr. Gary Fieger of A. Gary Fieger Associates, Inc., in his capacity as a real estate consultant on this project, was authorized by PREFCO and its advisors to submit that proposal to you." SBC did not act on the PREFCO proposal, which expired by its terms. In early June 1997, Fieger wrote

to Pitney Bowes in Connecticut to update Pitney Bowes on his contacts with SBC.

Rather than pursuing a private transaction, SBC hired Merrill Lynch to act as its financial advisor for the headquarters project. Merrill Lynch sent out an RFP to numerous potential investors, including Pitney Bowes, in order to solicit interest in the project. In June 1997, Merrill Lynch sent confidentiality agreements and equity offering memoranda to prospective investors, including Pitney Bowes. Fieger received a copy of this mailing because Merrill Lynch believed he was acting as Pitney Bowes's advisor. In June 1997, Fieger received a letter from SBC which stated that SBC would send Fieger the RFP "consistent with all our recent conversations." At the end of the month, Fieger forwarded the Merrill Lynch documents to Pitney Bowes in Connecticut and noted in his cover letter that, although "[s]ome of the criteria have changed as an outgrowth of re-thinking on the part of SBC, ... the essence of the deal is substantially the same." He continued:

> It is my opinion, having been involved, for more than a year, in discussions with SBC relative to the financing of this deal, that your offer of April 29th, 1997, which A. Gary Fieger Associates Inc. transmitted, on your behalf, was a very competitive and aggressive bid and should prevail at the end of the day.

In mid-July, Pitney Bowes responded to the RFP by submitting to Merrill Lynch a financing proposal that had been prepared without Fieger's involvement. This proposal was considerably more detailed that the April 29th Pitney Bowes submission which Fieger had made to SBC.

On July 18, 1997, Pitney Bowes sent a letter to Fieger describing its long-term involvement with the SBC Stamford project and stating:

The purpose of this letter is to make it clear to you that PREFCO has not engaged you or your company to represent it in connection with this proposed transaction. Our only interest in dealing with you in April was in connection with a privately negotiated transaction, based on our understanding that you had special business connections with SBC and the Project. PREFCO has very broad experience is [sic] bidding on and negotiating sale-leaseback transactions and has no need for a broker or financial advisor in that regard.

Therefore, we request that you desist from any further communications with any person involved in this transaction, including without limitation SBC or Merrill Lynch, to the effect that you in any way represent PREFCO or are acting as an advisor to PREFCO.

In September 1997, Fieger sent a letter to Pitney Bowes at its Connecticut offices in which he stated that Pitney Bowes's letter appeared "to be an attempt to deprive ... A. Gary Fieger Associates, Inc .... of compensation in this matter" although he had provided Pitney Bowes with substantial assistance.

On August 8, 1997, Merrill Lynch advised Pitney Bowes that SBC had decided to conduct further negotiations with Pitney Bowes. On September 5, 1997, SBC and Pitney Bowes executed a letter of intent, and the sale and leaseback transaction closed in December 1997. According to Pitney Bowes, Fieger was not involved in the negotiations conducted with Merrill Lynch. The final sale and leaseback agreement between Pitney Bowes and SBC included the following choice-of-law provision:

Section 27.8. *Governing Law.* This Lease shall in all respects be governed by, and construed in accordance with, the laws of the State of Connecticut

applicable to agreements made and to be performed entirely within the such State, including all matters of construction, validity and performance.

The land lease agreement included the following statement: "This Agreement shall be governed by and interpreted in accordance with the laws of the State of Connecticut."

In January 1999, Fieger commenced this action in New York State Supreme Court, and, in February 1999, defendants removed it to the Southern District of New York based on diversity. Fieger alleged a breach-of-contract claim for $1,365,000, plus interest, which represents .75% of the $182 million Pitney Bowes paid to acquire the SBC Stamford property. Specifically, he alleged that:

> the defendants ... have failed to pay said agreed commission to the plaintiff or to make available said commission from the funds paid for the acquisition of said realty interests [and]

> [u]pon information and belief, the defendant PREFCO XXII Limited Partnership, assumed the obligations of PBCC and PREFCO to pay the Swiss Bank Corporation the agreed price for the acquisition of its said Stamford realty interests, which included all transactional charges up to 2–1/2% of the acquisition price, which 2–1/2% included the ¾ of one (1%) percent which PBCC and PREFCO had agreed to pay or make available for payment to plaintiff.

Fieger also alleged a quantum meruit claim on the ground that he had rendered services to defendants with the expectation of compensation, the reasonable value of which was $1.82 million, or 1% of the purchase price for the SBC property, plus interest. In their answer, defendants raised several defenses, including that Fieger's claims are barred because he was not a licensed Connecticut real estate broker and that he was not a "procuring cause" of the transaction.

Defendants moved for summary judgment, which was granted. In its thoughtful opinion, the district court determined that Connecticut law should be applied and dismissed Fieger's claims, reasoning that under Connecticut law, he was barred from recovering any fee arising out of the sale of real estate in Connecticut because he was not licensed in Connecticut as a real estate broker.

On appeal, Fieger pursues both his contract and his quantum meruit claims. The theory behind Fieger's contract claim against Pitney Bowes and PREFCO seems to be that with the initial proposal submitted to SBC in April 1997, Pitney Bowes and PREFCO committed themselves to pay Fieger a fee if they completed the deal with SBC. Fieger claims that this arrangement was memorialized in UBS's April 29, 1997 letter to him. According to Fieger, his fee was contingent on the completion of the Stamford project's financing. Fieger claims that his fees became due in December 1997, when the sale-leaseback agreement was finalized. With regard to his contract claim against PREFCO XXII, Fieger alleges that in the December 1997 agreement between PREFCO XXII and SBC, PREFCO XXII agreed to assume the transactional charges that Pitney Bowes and PREFCO had agreed to pay him. Thus, although Fieger's complaint states that he alleges one contract cause of action, he in fact alleges two such claims: a first-party claim against Pitney Bowes and PREFCO based on the April 29th letter, and a third-party beneficiary claim against PREFCO XXII based on the December 1997 assumption. His quantum meruit claim is based on the theory that if there was no valid contact between himself and defendants, then defendants are equitably obliged to pay him for the services

he rendered in facilitating the negotiations between defendants and SBC. Defendants deny that they are bound by any agreement between UBS and Fieger, such as the April 29th letter, and further deny that Fieger is an intended beneficiary of the December contract. They also deny that Fieger's work on their behalf led to the consummation of the SBC–PREFCO XXII sale-leaseback agreement.

## DISCUSSION

### I. Choice of Law

■ The Court of Appeals reviews the district court's choice-of-law determination and its grant of summary judgment *de novo. See Caruolo v. John Crane, Inc.,* 226 F.3d 46, 57 (2d Cir.2000) (citations omitted) (choice-of-law); *Curley v. AMR Corp.,* 153 F.3d 5, 11 (2d Cir.1998) ("We review a grant of summary judgment *de novo* to ascertain whether the substantive law was properly applied and, viewing the evidence in the light most favorable to the plaintiff, to determine whether there are genuine issues of material fact necessitating a trial.").

■ A federal trial court sitting in diversity jurisdiction must apply the law of the forum state to determine the choice-of-law. *See Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 497, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) (cited in *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.,* 230 F.3d 549, 556 (2d Cir.2000)). "In New York, the forum state in this case, the first question to resolve in determining whether to undertake a choice of law analysis is whether there is an actual conflict of laws." *Curley,* 153 F.3d at 11 (citing *Matter of Allstate Ins. Co. & Stolarz,* 81 N.Y.2d 219, 597 N.Y.S.2d 904, 613 N.E.2d 936 (1993)). "It is only when it can be said that there is no actual conflict that New York will dispense with a choice

of law analysis." *Id.* We will consider this question with regard to each of Fieger's claims.

### A. Choice-of-law Provision

■ The December 1997 financing contract upon which Fieger relies for his claim against PREFCO XXII includes a Connecticut choice-of-law provision, while the April 29th letter includes no such reference to state law. "New York law is clear in cases involving a contract with an express choice-of-law provision: Absent fraud or a violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction." *Hartford Fire Ins.,* 230 F.3d at 556. Connecticut law "give[s] effect to an express choice of law by the parties to a contract provided that it was made in good faith." *Elgar v. Elgar,* 238 Conn. 839, 679 A.2d 937, 942 (1996); *see Reichhold Chemicals, Inc. v. Hartford Accident & Indem. Co.,* 252 Conn. 774, 750 A.2d 1051, 1055 (2000) (Connecticut court would apply "most significant relationship" test in evaluating a choice-of-law question "[w]here there is no choice of law provision in the contract"). With respect to enforcing a choice-of-law provision in a contract, New York and Connecticut law do not conflict. As there are no allegations of fraud, bad faith or unfavorable public policy aspects to the choice-of-law provision, the court will enforce it. Accordingly, with regard to the contract claim against PREFCO XXII, Connecticut law governs.

### B. Contacts Analysis

With respect to the contract claim against Pitney Bowes and PREFCO, and the quantum meruit claim against all defendants, the court must first compare the laws of New York and Connecticut to determine if they conflict. *See Curley,* 153

F.3d at 11. Each state requires that real estate brokers working in the respective state be licensed in order to bring actions for commissions, *see* Conn. Gen.Stat. § 20–325a (2000); N.Y. Real Prop. L. § 442–d (2000); however, Fieger was licensed in New York only. Consequently, although the New York and Connecticut real estate licensing statutes do not directly conflict, the application of each statute will lead to a different result: Under New York law, his claims are not barred, while under Connecticut law, they are. Because there is a conflict, we must resolve the choice-of-law issue, using New York choice-of-law principles.

New York employs two different choice-of-law analyses, one for contract claims, another for tort claims. *See Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1539–41 (2d Cir.1997). With regard to the Pitney Bowes and PREFCO contract claim, it is clear that the contract law analysis would apply. With respect to a quantum meruit claim, we are not aware of any published New York decision that has stated the appropriate conflict-of-law test to apply to such a claim. Under New York law, a quantum meruit claim is a claim in quasi-contract. *See Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 69 (2d Cir.2000); *Futterman Org., Inc. v. Bridgemarket Assocs. L.P.*, 278 A.D.2d 105, 718 N.Y.S.2d 40, 41 (App. Div. 1st Dep't 2000) (quantum meruit claims rest on implied contract); *Landcom, Inc. v. Galen Lyons Joint Landfill Comm'n*, 259 A.D.2d 967, 687 N.Y.S.2d 841, 842 (App. Div. 4th Dep't 1999) (quantum meruit is a quasi-contract claim). Fieger's claimed entitlement to a commission payment sounds more in contract than in tort, arising as it does from the benefit allegedly conferred upon defendants by plaintiff's business advice. Accordingly, the court will apply New York's choice-of-law analysis for contract claims to Fieger's quantum meruit claim.

Under the contracts analysis, the court evaluates the "center of gravity" or "grouping of contacts", with the purpose of establishing which state has "the most significant relationship to the transaction and the parties." *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*, 84 N.Y.2d 309, 618 N.Y.S.2d 609, 612, 642 N.E.2d 1065 (1994) (quoting Restatement (Second) of Conflict of Laws § 188[1] ). In developing this test, the New York Court of Appeals relied on the Second Restatement of Conflict of Laws, which "in addition to the traditionally determinative choice of law factor of the place of contracting, offers four other factors to be considered in establishing this 'most significant relationship': the places of negotiation and performance; the location of the subject matter; and the domicile or place of business of the contracting parties." *Id.* (citing Restatement (Second) of Conflict of Laws § 188[2] ). Additionally, with regard to the law governing financial transactions arranged in New York, New York has emphasized the state's role as an international financial center, *see Intercontinental Planning, Ltd. v. Daystrom, Inc.*, 24 N.Y.2d 372, 300 N.Y.S.2d 817, 826–27, 248 N.E.2d 576 (1969), and considered the state's need to ensure that its licensed professionals are paid for services provided within the state, *see Rosenberg & Rosenberg, P.C. v. Hoffman*, 195 A.D.2d 343, 600 N.Y.S.2d 228, 229 (App. Div. 1st Dep't 1993) (discussing need for state's licensed brokers to be compensated); *see also Istim, Inc. v. Chemical Bank*, 78 N.Y.2d 342, 575 N.Y.S.2d 796, 799, 581 N.E.2d 1042 (1991) (noting, in the context of a suit over an attorney's lien, that "New York's undisputed interest in protecting its attorneys' ability to be paid for legal services rendered is paramount").

■ The district court, relying on *Madison Realty, Inc. v. Neiss*, 253 A.D.2d 482, 676 N.Y.S.2d 672, 673 (2d Dep't 1998) (internal citation and quotation marks omitted), based its conflict-of-law analysis primarily on the principle that "[c]ontracts referring to the transfer of title to land are governed by the law of the place where the land is situated." *Id.* This statement is true when the validity of a conveyance itself is in question. *See James v. Powell*, 19 N.Y.2d 249, 279 N.Y.S.2d 10, 15, 225 N.E.2d 741 (1967) (choice of law as to legal consequences of conveyance should be determined by "jurisdiction empowered to deal with the [r]es"). Notwithstanding, New York courts have recognized the "governmental interest" underlying state licensing statutes, to wit, that a state may have a "strong interest in regulating the activities of real estate brokers who perform services in connection with the sale of ... property" located within that state. *Madison Realty*, 676 N.Y.S.2d at 674 (Florida real estate licensing statute); *see Marina Mgmt. Corp. v. Brewer*, 572 F.2d 43, 47 (2d Cir.1978) ("The [Connecticut] license requirements furnish supervision and regulation of the real estate business and make possible the elimination of the incompetent and unscrupulous agent."); *cf. Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 98 (2d Cir.2000) (applying New York law in a suit alleging defamation arising from a report indicating "improper appraiser bias" by plaintiff where, *inter alia*, "the appraisal of which is at the heart of this suit—is located in New York").

In contrast, when an action involves real estate but does not challenge the title to, or succession or conveyance of, property, the situs of the property is viewed as one in " 'the spectrum of significant contacts' " considered in connection with the conflict-of-law analysis. *Madison Realty*, 676 N.Y.S.2d at 673 (quoting *Stolarz*, 81 N.Y.2d at 226, 597 N.Y.S.2d 904, 613

N.E.2d 936). Stated another way, in these cases the situs of the property is not dispositive of our choice-of-law analysis.

Although the district court placed heavy reliance on the situs rule, it evaluated three cases in which the situs of the property was just one of several factors in a conflict-of-law analysis. In *Madison Realty v. Neiss*, 253 A.D.2d 482, 676 N.Y.S.2d 672, 673 (2d Dep't 1998), the state court applied the "center of gravity" or "grouping of contacts" theory to determine that Florida law applied to a claim by a New York broker for commission on sale of Florida property. The *Madison Realty* court noted that the brokerage fee was earned in connection with the transfer of property, the purchaser was registered with the seller's agent in Florida as a potential purchaser, and eventually an offer for the property was made in Florida to the seller's agent in Florida. On these facts, Florida's contacts were greater than New York's. In *Rosenberg & Rosenberg, P.C. v. Hoffman*, 195 A.D.2d 343, 600 N.Y.S.2d 228, 229 (1st Dep't 1993), which the district court rejected, the state court applied an interests analysis to a New York real estate broker's claim for a commission for securing financing from a New York bank for the purchase of a New Jersey condominium, and found that New York had the primary interest in the deal because the work to secure the financing had been performed in New York. The court stated:

> [T]he interest of New York in seeing that its licensed brokers are compensated on contracts arising from initial contacts in New York and made in New York for obtaining financing from whatever source and the fact that a New York source was found and the loan commitment issued and the loan agreement closed in New York would indicate

the propriety of the application of New York law.

*Id.* at 229. The district court also rejected reliance on *Advance Realty Associates, Inc. v. First Bank National Association,* No. 89 Civ. 4843(SWK), 1991 WL 64153, at *2 (S.D.N.Y. Apr.15, 1991). In conducting an interests analysis, the *Advance Realty* court found that New York had the primary interest in a claim by a New York broker for commission on the sale of Georgia property because the broker's principal place of business was New York while the purchaser's was Minnesota; the relationship was initiated through a series of conversations in New York, Nebraska, and Minnesota; the broker procured a buyer in New York; and discussions regarding the commission and negotiations regarding the property sale occurred in New York. *Id.*

Cases from other jurisdictions support the approach of considering the situs of the real estate that is the subject of a transaction as just one of several contacts assessed in an interests analysis. In an almost century-old case concerning the application of the situs rule, *Selover, Bates & Co. v. Walsh,* 226 U.S. 112, 123, 33 S.Ct. 69, 57 L.Ed. 146 (1912), the plaintiff claimed that the law of Colorado must apply to the interpretation of a contract drafted in Minnesota because the contract covenanted certain rights to property in Colorado. The Supreme Court stated: "The contention is that the [Minnesota] statute, as applied, affected the transfer of land situated in another state, and outside of, therefore, the jurisdiction of the state of Minnesota. In other words, it is contended that the law of Colorado, the situs of the property, is the law of the contract." *Id.* at 123, 33 S.Ct. 69. The Court disagreed, holding that the contract was "strictly personal," and "[i]t in no way affects the land or seeks any remedy against it." *Id.* It relied on *Polson v.*

*Stewart,* 167 Mass. 211, 45 N.E. 737 (1897), in which the court had explained:

It is true that the laws of other states cannot render valid conveyances of property within our borders which our laws say are void, for the plain reason that we have exclusive power over the *res.* But the same reason inverted establishes that the *lex rei sitae* cannot control personal covenants, not purporting to be conveyances between persons outside the jurisdiction, although concerning a thing within it.

*Id.* at 738 (internal citation omitted); *see Coldwell Banker & Co. v. Karlock,* 686 F.2d 596, 599 (7th Cir.1982) (finding that "[a] real estate brokerage contract is generally characterized as a contract for personal services rather than a contract conveying an interest in land," and performing a conflict-of-law analysis by assessing contacts with brokerage arrangements, including, *inter alia,* the situs of the property); *Dorothy K. Winston & Co. v. Town Heights Dev., Inc.,* 376 F.Supp. 1214, 1218–19 (D.D.C.1974) (concluding that situs rule did not control contacts analysis and Florida broker's law did not bar commission for a District of Columbia broker who procured a purchaser for property in Florida); *see also Scott/Hubbard Co. v. Sika Chem. Co.,* 694 F.Supp. 1311, 1314–15 (N.D.Ill.1988) (holding that the situs of an acquired Missouri corporation was not determinative of choice-of-law question as to finder's fee contract between a finder and a purchaser, both non-Missouri corporations); *Ames v. Ideal Cement Co.,* 37 Misc.2d 883, 235 N.Y.S.2d 622, 628 (Sup. Ct. New York County 1962) (holding, in the analogous context of choice-of-law in relation to the sale of personal property, that compensation for arranging the sale is assessed apart from underlying sale).

■ Applying New York's contract conflict-of-law test, the district court determined that Connecticut had the primary contacts with the controversy because the situs of the property was in Connecticut, the defendants are Connecticut corporations, the defendants' interest was solicited in Connecticut and the final agreement between defendants and SBC was consummated in Connecticut. In this case, we believe that the district court's analysis was too focused on the final transaction between SBC and PREFCO XXII, rather than on Fieger's services which form the basis of his contract claim against Pitney Bowes and PREFCO, and his quantum meruit claim. The present case more closely resembles the *Rosenberg* case, which the district court rejected, than *Madison Realty* upon which it relied, because Fieger's claims do not address the validity of the conveyance or negotiation in Connecticut, but rather his involvement with the negotiations and the structuring of the financing in New York. *But see Agency Rent A Car Sys. v. Grand Rent–A–Car Corp.*, 98 F.3d 25, 30 (2d Cir.1996) (in evaluating contacts of defendant-licensees in the context of personal jurisdiction analysis under New York's long-arm statute, noting that "[i]ndeed, we question whether, in an age of e-mail and teleconferencing, the absence of actual personal visits to the forum is any longer of critical consequence").

Fieger negotiated with UBS, SBC, Merrill Lynch and Pitney Bowes from his office in New York. He met and communicated with representatives of the four companies in New York and Switzerland; these communications are the heart of Fieger's efforts on behalf of defendants to secure the SBC deal. UBS's letter to Fieger setting forth the terms of the financing was sent from its New York offices to Fieger's New York office. Pitney Bowes provided the term sheet to Fieger in New York and authorized his contact with SBC in New York on Pitney Bowes's behalf by a letter sent to New York. Pitney Bowes confirmed Fieger's role as its representative by letter to SBC in New York in May 1997. In the summer of 1997, SBC hired Merrill Lynch in New York, and Pitney Bowes responded positively to the New York solicitation for interest. To the extent that Fieger reached into Connecticut, the earliest communication from plaintiff to Pitney Bowes in Connecticut occurred in June 1997. Notably, it was UBS, not Fieger, that solicited Pitney Bowes's interest in the project in Connecticut. Finally, while defendants are located in Connecticut, because defendants operate a national business, it should come as little surprise to them that their activities might be assessed under the laws of a state other than Connecticut.

■ We conclude that the majority of the relevant contacts are with New York. When coupled with New York's policy interests in recognizing the importance of the state's professional brokers in arranging complex international financing transactions, New York has the more significant interest in the relationship between Fieger and defendants. Accordingly, New York law applies to the contract claim against Pitney Bowes and PREFCO, as well as to the quantum meruit claim.[1]

1. There is no conflict in applying New York law to one claim and Connecticut law to another. Under the doctrine of depecage as applied by New York courts, "the rules of one legal system are applied to regulate certain issues arising from a given transaction or occurrence, while those of another system regulate other issues." *Hutner v. Greene*, 734 F.2d 896, 901 (2d Cir.1984) (internal quotation marks and citation omitted); *Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786, 794–95 (2d Cir.1980) (applying

## II. Broker Licensing Statutes

### A. Connecticut

Connecticut law regarding real estate licenses provides in part:

> No person who is not licensed under the provisions of this chapter, and who was not so licensed at the time the person performed the acts or rendered the services for which recovery is sought, shall commence or bring any action in any court of this state, after October 1, 1971, to recover any commission, compensation or other payment with respect to any act done or service rendered by the person, the doing or rendering of which is prohibited under the provisions of this chapter except by persons duly licensed under this chapter.

Conn. Gen.Stat. § 20–325a(a).[2] Section (b) of § 20–325a, which requires that valid real estate listings include several specific items, states:

> No person, licensed under the provisions of this chapter, shall commence or bring any action with respect to any acts done or services rendered after October 1, 1995, as set forth in subsection (a), unless the acts or services were rendered pursuant to a contract or authorization from the person for whom the acts were done or services rendered. To satisfy the requirements of this subsection any contract or authorization shall: (1) Be in writing, (2) contain the names and addresses of the real estate broker performing the services and the name of the person or persons for whom the acts were done or services rendered, (3) show the date on which such contract was entered into or such authorization given, (4) contain the conditions of such contract or authorization, (5) be signed by the real estate broker or the real estate broker's authorized agent, (6) if such contract or authorization pertains to any real property, include the following statement: "THE REAL ESTATE BROKER MAY BE ENTITLED TO CERTAIN LIEN RIGHTS PURSUANT TO SECTION 20–325a OF THE CONNECTICUT GENERAL STATUTES", and (7) be signed by the person or persons for whom the acts were done or services rendered or by an agent authorized to act on behalf of such person or persons, pursuant to a written document executed in the manner provided for conveyances in section 47–5, except, if the acts to be done or services rendered involve a listing contract for the sale of land containing any building or structure occupied or intended to be occupied by no more than four families, be signed by the owner of the real estate or by an agent authorized to act on behalf of such owner pursuant to a written document executed in the manner provided for conveyances in section 47–5.

Conn. Gen.Stat. § 20–325a(b).

The chapter defines a real estate broker or brokers as

> any person, partnership, association, limited liability company or corporation which acts for another person or entity and for a fee, commission or other valuable consideration, lists for sale, sells, exchanges, buys or rents, or offers or

---

federal choice-of-law to certain claims and New York choice-of-law to other claims); *Babcock v. Jackson*, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 750–52, 191 N.E.2d 279 (1963) (the host-guest issue would be governed by New York law, while issue of defendant's negligence under "rules of the road" would be governed by Ontario law).

**2.** After this suit was commenced, Connecticut General Statute § 20–325a was amended. *See* Public Acts 2000, No. 00–21, § 1 and Public Acts 2000, No. 00–160, § 2.

attempts to negotiate a sale, exchange, purchase or rental of, an estate or interest in real estate, or ... collects or offers or attempts to collect rent for the use of real estate.

Conn. Gen.Stat. § 20–311(1)(A).

The parties dispute the proper scope of Section 20–325a(a), a question which is the source of some controversy in Connecticut's courts. Fieger claims that he did not act as a real estate broker as that term is defined in Connecticut law, but instead served as a financial advisor to Pitney Bowes. Defendants argue that Fieger's services come within the Connecticut real estate licensing statute, and thus Fieger cannot bring a claim for a commission based on those services because he was not licensed as a real estate broker in Connecticut when he provided them. It is undisputed that Fieger did not possess a valid Connecticut real estate license at all times relevant to the instant action. Very few Connecticut courts have addressed the application of Section 20–325a(a) to the claim of a buyer's broker or financial advisor, and the Connecticut Supreme Court has not spoken on the issue.

■ "Absent law from a state's highest court, a federal court sitting in diversity has to predict how the state court would resolve an ambiguity in state law." *Michalski v. Home Depot, Inc.*, 225 F.3d 113, 116 (2d Cir.2000). In predicting how a state's highest court would rule on an issue, it is helpful to consider the decisions of the state's trial and appellate courts. *Id.* The holding of "an intermediate appellate state court ... is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *West v. AT & T*, 311 U.S. 223, 237, 61 S.Ct. 179, 85 L.Ed. 139 (1940) (cited in *Michalski*, 225 F.3d at 116). "Other data include relevant case law from other jurisdictions on the same or analogous issues, scholarly writings in the field, and any other resources available to the state's highest court." [3] *Michalski*, 225 F.3d at 116 (citing *Leon's Bakery, Inc. v. Grinnell Corp.*, 990 F.2d 44, 48 (2d Cir.1993)).

■ Two Connecticut cases, both of which applied Section 20 325a(a) to bar an unlicensed broker's action for commission, present facts similar to those of the case before us. In *Wilder Group, Inc. v. Byers*, No. Civ. 94–0536062, 1995 WL 127877, at *4 (Conn.Super.Ct. Mar.14, 1995), the plaintiff, an unlicensed real estate broker, sued the defendant for a commission based on an alleged co-brokerage agreement. Although the plaintiff did not list the property, the court held that he had engaged in real estate activities because as a co-broker, the plaintiff, like the listing broker, "attempt[ed] to negotiate the sale of the property in question by introducing his customers to it, and thereby attempt[ed] to interest them in it." *Id.* In doing so, the plaintiff served as a "conduit" for the negotiation and sale of the property, and in "taking an active role in finding a purchaser for the defendant broker's listed property—was brokerage activity for which a Connecticut real estate broker's license was required." *Id.* at *5.

**3.** Many states have similar statutes. For articles collecting such statutes, *see* C. Clifford Allen, III, *Necessity of Having Real–Estate Broker's License in Order to Recover Comm'n as Affected by Fact that Business Sold Includes Real Prop.*, 82 A.L.R.3d 1139 (1978 & Supp.); Joel E. Smith, *Procurement of Real–Estate Broker's License Subsequent to Execution of Contract for Servs. as Entitling Broker to Compensation for Servs.*, 80 A.L.R.3d 318 (1977 & Supp.); C.C. Marvel, *Validity of Statute or Ordinance Requiring Real Estate Brokers to Procure License*, 39 A.L.R.2d 606 (1955 & Supp.).

In *Wilder,* the plaintiff argued that Section 20–325a(a) did not apply to co-brokerage agreements, based on cases in which Section 20–325a(b) had been limited to listing agreements. *Id.* at *5–*6 (relying on *Conda v. Christensen,* 11 Conn.App. 557, 528 A.2d 1159, 1160–63 (1987)); *see also Dow & Condon, Inc. v. Anderson,* 203 Conn. 475, 525 A.2d 935 (1987) (§ 20–325a(b) did not bar real estate broker's action for deceptive practices against co-broker); *Holmes v. Preferred Props., Inc.,* 190 Conn. 808, 462 A.2d 1057, 1059–60 (1983) (§ 20–325a(b) did not apply to suit to enforce real estate employment contract to receive share of commissions); *William Pitt, Inc. v. Taylor,* 186 Conn. 82, 438 A.2d 1206, 1208 (1982) (§ 20–325a(b) "pertains only to the listing contract and not to the sales contract"); *Conda,* 528 A.2d at 1160–63 (§ 20–325a(b) does not bar a licensed real estate broker's action to enforce a co-brokerage contract to recover portion of commission received by defendant co-broker); *Perkins v. Elston Assocs.,* No. Civ. 970397, 459S, 1998 WL 550764, at *1 (Conn.Super.Ct. Aug. 12, 1998) (collecting § 20–325a cases, and stating, "[g]enerally, courts have found that General Statutes §·20–325a applies only to listing agreements between the property owner and a real estate broker"). The *Wilder* court rejected this argument, reasoning:

Unlike subsection (b), subsection (a) contains no language specifically [suggesting that its scope is limited to] agreements between brokers and property sellers. To the contrary, it expressly bars any suit to recover a commission by any person not licensed under [the real estate licensing law] for any act done or service rendered for which a valid Connecticut real estate license is required.

The full range of brokerage activity which is forbidden to any person who is not licensed under the provisions of [the real estate licensing law] is far broader than that which is specifically forbidden to licensed real estate brokers under subsection (b) of Section 20–325a. It therefore follows that subsection (a)'s unqualified prohibition of fee-recovery lawsuits by those who have engaged in unlicensed brokerage activity must be read more broadly than subsection (b)'s parallel proscription of such lawsuits by licensed brokers whose listing agreements fail to meet the requirements of that subsection. Indeed, in the absence of qualifying language in the statute, subsection (a) must be read to bar fee-recovery lawsuits for unlicensed brokerage activity of every kind and description for which a valid Connecticut broker's license is required. This, then, is necessarily broad enough to include the unlicensed rendering of services as a non-listing co-broker, finding a buyer for another broker's listed property.

*Id.* at *7. We believe that this explication of the relationship between Section 20–325a(a) and Section 20–325a(b) is accurate because it is faithful to both the letter of the statute and the policy underlying it. Thus, the cases limiting the scope of Section 20–325a(b) do not limit the scope of Section 20–325a(a). The *Wilder* court concluded:

[T]he prohibition against such lawsuits by non-licensed persons who engage in brokerage activity for which a valid Connecticut broker's license is required is absolute and unlimited. Therefore, because the activity for which the unlicensed plaintiff here seeks to recover a commission was plainly brokerage activity in which he had no right to engage without a valid Connecticut real estate broker's license, he is barred by subsection (b) of Section 20–325a from pursuing this lawsuit.

*Id.* at *8.

In *Gagnon v. Shiller,* No. Cv. 950374649, 1998 WL 346645, at *1 (Conn.Super.Ct.

June 17, 1998), plaintiffs, who were not licensed real estate brokers, claimed that defendants had orally agreed to pay them "a consulting fee for the acquisition and development of two property sites" but had failed to pay the fee. Defendants raised Section 20–325a(a) as a defense. The trial court stated that Connecticut had applied a "New Jersey rule" to the brokerage law, "which denies recovery to an unlicensed broker if the transaction includes any real estate regardless of its dominance." [4] *Id.* at \*2 (internal quotation marks omitted). Relying on the *Wilder Group* decision, the court continued: "Serving as a 'conduit' in the negotiations between the potential buyer and seller of property constitutes brokerage activity within the meaning of General Statutes § 20–311(3)." *Id.* at \*3. "Connecticut requires a license if the transaction involves any real estate." *Id.* (internal quotation marks and citation omitted). Where plaintiffs had described their services as to "coordinate, negotiate, and pursue the acquisition of properties," the court determined that "[t]he activities of the plaintiffs, as described in their complaint, constitute brokerage activities which the plaintiffs could not lawfully engage in without a valid Connecticut real estate broker's license," *id.*, and dismissed the complaint.

Generally, Section 20–325a(a) serves as a complete bar to an unlicensed broker's claim for a real estate commission; however-er, some Connecticut courts have refused to apply Section 20–325a(a) to prohibit brokers' claims for employee compensation, such as claims for the division of sales commissions between employers and employees. *See Holmes*, 462 A.2d at 1059–60 ("We do not view the compensation due from a real estate broker to his salesman-employee as being a commission within the contemplation of [§ 20–325a].... What the plaintiff and the defendant really contracted for is not the payment of a commission but a division of the fruits of their joint efforts which come to them from the owner in the shape of a commission."); *Perkins*, 1998 WL 550764, at \*1–\*2 (Section 20–325a did not govern claim of former employee of real estate brokerage for share of commission as part of her compensation due under her employment agreement). These cases have carved out an exception to Section 20–325a(a) when the claim was based on a contract other than an agreement between the sellers and the purchasers. Fieger's claim does not benefit from this exception because he seeks payment from defendants, the purchasers, and he does not, as in these cases, advance a claim against another broker for part of a commission already paid by a purchaser. *See id.*

As noted above, our task is to predict how the Connecticut Supreme Court would apply Section 20–325a(a) to the evidence before us.[5] In his complaint, Fieger alleg-

---

4. This characterization of the so-called "New Jersey rule" is incorrect. *See, e.g., Thomas v. Daubs*, 291 Ill.App.3d 682, 226 Ill.Dec. 15, 684 N.E.2d 1011, 1014 (1997) (describing various approaches to application of bar to claims by unlicensed brokers, and describing the New Jersey rule as a "pure severability rule" under which "if the personalty is susceptible to a reasonable valuation, then the broker is entitled to a commission for that portion of the transaction which constitutes personalty" and no commission for the real estate portion of the transaction).

5. While we hold that § 20–325a(a) bars plaintiff's contract claim, we cannot help but note the possibly perverse, unintended consequences of the statute's broad sweep. As one Connecticut court stated: "Although the statute in question appears to be used frequently as a lethal weapon by unscrupulous owners against honest brokers and though it appears that the legislature would not knowingly have intended such a use this court must follow the clear language of the statute." *Ward Mfg'g Co. v. Lyons & Assocs., Inc.*, 1990 WL 272157, at \*4 (Conn.Super.Ct. Apr.18, 1990). We are

es that he entered into an agreement with defendants under which he provided them with financial advice with regard to the SBC headquarters financing. The evidence submitted in connection with the summary-judgment motion shows that plaintiff was the conduit through which Pitney Bowes submitted its term sheet to SBC in April 1997. Fieger alleges that defendants failed to pay "said agreed commission to the plaintiff or to make available said commission from the funds paid for the acquisition of said realty interests." Based on our canvas of Connecticut law, we believe that a Connecticut court would agree with the district court's determination that this evidence shows that Fieger's activities constituted real estate activity under Connecticut law. *See* Conn. Gen. Stat. § 20–311.

We also believe that a Connecticut court would hold that Fieger's claim is more similar to those claims addressed in *Wilder* and *Gagnon,* in which the court held that Section 20–325a(a) bars the claims, than to those cases in which the courts found Section 20–325a to be inapplicable. Here, Fieger claims that he facilitated the sale and leaseback of the Stamford headquarters by serving as an intermediary between defendants and SBC. Thus, like the plaintiffs in *Wilder,* he seeks recompense for his services in introducing defendants to a property and helping them negotiate a deal with the property owner. *See Wilder Group,* 1995 WL 127877, at *4–*5; *see also Gagnon,* 1998 WL 346645, at *2 (seeking a consulting fee for arranging purchase of property). As noted above, his claims do not fall within the court-created listing-agreement or commission-sharing exceptions to § 20–325a. Accordingly, Fieger's contract claim against PREFCO XXII is barred by Section 20–325a(a) because he was not a licensed real estate broker in Connecticut.

## B. New York

Fieger's quantum meruit claim and his contract claim against Pitney Bowes and PREFCO remain alive under New York law. Defendants argue that they should be dismissed because Fieger was not the procuring cause of the transaction and therefore is not entitled to a commission. The district court did not reach this defense because it dismissed plaintiff's claims as barred by Connecticut law.

 Under New York law, to state a contractual claim for a commission, a broker must prove that the broker is duly licensed; that it had a contract, express or implied, with the party to be charged with paying the commission; and that it was the procuring cause of the sale. *See Friedland Realty Inc. v. Piazza,* 273

---

in no position to characterize the nature of the dealings of the parties before us, but as a general proposition, we agree with the *Ward Manufacturing* court that § 20–325a(a) is susceptible to abuse. For example, an owner could knowingly accept without complaint the services of an unlicensed broker, and might never allege that it was harmed by the broker's lack of a Connecticut broker's license. Yet, the owner would be able to raise § 20–325a(a) as a complete defense to the court's ability to hear the broker's claim on its merit. In a scenario like the present one, where sophisticated, experienced parties participate together in extended business negotia- tions to prepare a multimillion dollar transaction, it appears to us that the application of § 20–325a(a) may be extended well beyond the protection of the unsophisticated home buyer that the Connecticut legislature intended to protect when enacting the statute. *See An Act Concerning the Recovery of Commissions Arising Out of Real Estate Transactions: Hearing on Public Act 378 Before the Ins. & Real Estate Comm.,* 1971 Leg. 10 cap.–11 cap. (Conn. Mar. 31, 1971) (statement of Mr. Kotkin); *see also Marina Mgmt. Corp.,* 572 F.2d at 47 (discussing purposes of Connecticut's real estate licensing requirements).

A.D.2d 351, 710 N.Y.S.2d 97, 98 (2nd Dep't 2000) (affirming grant of summary judgment in favor of plaintiff broker based on implied contract where "[t]he evidence adduced established an amicable atmosphere, set up by the plaintiff, in which negotiations proceeded and generated a chain of circumstances that proximately led to the lease deal"). To establish a quantum meruit claim under New York law, a plaintiff must prove that the defendant was enriched, that such enrichment was at the plaintiff's expense, and that circumstances were such that equity and good conscience require that the defendant should compensate the plaintiff. *See R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 60 (2d Cir.1997). In order to establish a quantum meruit claim to a commission, a broker must show that "a sale is effected through his agency as the procuring cause." *Id.* (internal quotation marks omitted); *see Edward S. Gordon Co. v. Peninsula N.Y. P'ship,* 245 A.D.2d 189, 666 N.Y.S.2d 170, 170 (1st Dep't 1997) (affirming quantum meruit recovery where court had "ample basis for finding that the plaintiff was the procuring cause for the lease that was subsequently consummated"); *Wertkin v. Depasquale,* 70 N.Y.S.2d 225, 226 (Sup.Ct. Bronx County 1947) (affirming award on a quantum meruit basis and noting that "[i]t is well-settled that if a broker was the procuring cause of the transaction in suit, he is entitled to compensation").

 To establish either type of claim, a plaintiff must set forth evidence that he or she has performed acts of sufficient importance to the success of the deal that he or she should be reimbursed for his or her efforts. *See, e.g., Greene v. Hellman,* 51 N.Y.2d 197, 433 N.Y.S.2d 75, 81, 412 N.E.2d 1301 (1980) (describing minimum that a broker must do to warrant payment of commission as procuring cause); *Helmsley Spear, Inc. v. 150 Broadway N.Y. Assocs., L.P.,* 251 A.D.2d 185, 674 N.Y.S.2d 660, 661 (1st Dep't 1998) (where plaintiff made initial contact between buyer and seller but a second broker later facilitated the consummation of the deal, plaintiff failed to show that there was a "proximate link between the broker's efforts and the consummation of the transaction"); *Provost v. St. Francis Commandery Hall Ass'n of Schenectady, N.Y., Inc.,* 118 A.D.2d 922, 499 N.Y.S.2d 489, 490 (3d Dep't 1986) (broker who claims he was not involved in negotiation process must somehow otherwise establish entitlement to commission); *Briggs v. Rector,* 88 A.D.2d 778, 451 N.Y.S.2d 520, 522 (4th Dep't 1982) (to be a procuring cause a broker must "at least show that he created an amicable atmosphere in which negotiations went forward or that he generated a chain of circumstances which proximately led to the sale"). Whether a party acted as a broker and whether he or she was a procuring cause entitled to a commission are questions of fact to be determined by a factfinder. *See R.B. Ventures,* 112 F.3d at 60–61; *Kronish v. Koffman,* 170 A.D.2d 358, 566 N.Y.S.2d 60, 61 (1st Dep't 1991) (whether plaintiff acted as a finder or a broker is a factual issue for trial); *Smyczynski v. Goeseke,* 88 A.D.2d 765, 451 N.Y.S.2d 496, 497 (4th Dep't 1982).

 The court cannot presently grant defendants' request that it determine that plaintiff was not the procuring cause of the SBC transaction. On Fieger's view of the evidence, he helped prepare the terms that were the basis for the transaction, and he created the relationship between SBC and defendants which led to the December 1997 deal. On defendants' version, defendants only worked with plaintiff on the April 1997 proposal, which expired on its terms in May 1997. SBC's subsequent RFP created a new opportunity for defendants to bid on the SBC project, and defendants did not use plaintiff's assistance

in successfully concluding that deal. On the present record, the available facts may support either conclusion and are too conflicted for us to determine whether Fieger procured the SBC sale and leaseback for Pitney Bowes. Accordingly, the district court must provide for a factfinder to resolve this dispute. *See R.B. Ventures*, 112 F.3d at 61 (holding that a factfinder must determine whether plaintiff's involvement in initial real-estate development proposal, which was not built, entitled plaintiff to a commission for completed second proposal, which involved plans similar to those for the initial proposal).

The court has considered defendants' other arguments and finds them to be without merit.

Accordingly, the judgment of the district court is affirmed with regard to plaintiff's contract claim against PREFCO XXII, but vacated and remanded with respect to plaintiff's contract claim against Pitney Bowes and PREFCO, and the quantum meruit claim.