BILL CONDA *v.* CARL D. CHRISTENSEN ET AL.
(4830)

DUPONT, C. J., HULL and DALY, Js.

Argued May 12—decision released July 21, 1987

*Richard Bruno,* with whom, on the brief, was *Salvatore C. Agati,* for the appellants (defendants Keith Mahler et al.).

*Peter J. Ottomano,* for the appellee (plaintiff).

HULL, J. The plaintiff, Bill Conda, a licensed real estate broker, brought this action against Carl D. Christensen, Frank Lombard, Keith Mahler and I. Kenneth Mahler to recover a real estate commission. After a prejudgment remedy hearing, the case was withdrawn against Lombard and Christensen. After a trial to the court, judgment was rendered for the plaintiff

against the remaining defendants. From that judgment, those defendants[1] appeal, claiming that the court erred (1) in finding that a cobrokerage agreement for a real estate commission need not comply with General Statutes § 20-325a, and (2) in finding that the sale of the real estate in question entitled the plaintiff to a portion of the commission earned on the sale.

The court found the following facts. The plaintiff is a real estate broker licensed by the state of Connecticut. He is also the owner of Bill Conda Realty, a real estate business. The defendant I. Kenneth Mahler is a real estate broker licensed by the state of Connecticut. He is also the owner of Mahler Realty (Mahler). The defendant Keith Mahler is a real estate salesman. Prior to January 18, 1983, Mahler held an exclusive listing agreement for property owned by American Sheet Metals. On January 18, 1983, in exchange for a cobrokerage agreement giving him 45 percent of the commission earned, the plaintiff revealed that he had found a prospective purchaser, Berco Manufacturing (Berco). The cobrokerage agreement was reduced to writing by Mahler in a letter dated February 1, 1983.[2]

Berco gave the plaintiff a $5000 deposit when the contract of sale was drafted. The contract listed the purchase price as $500,000, but was subject to approval by the board of directors of Berco's parent company, Burndy Corporation (Burndy). Jeremiah Camarota, president of Berco, was told by the plaintiff and Mahler that he should deal directly with Mahler during the negotiations, and need not communicate through the plaintiff.

---

[1] As used in this opinion, the word defendants refers to the Mahlers.

[2] The cobrokerage agreement provided for payment to the plaintiff of 45 percent of the commission received, upon the sale of the property "to Berco Manufacturing and/or Burndy Corporation . . . ."

On March 28, 1983, Camarota informed American Sheet Metals and Mahler that the approval of Burndy was not forthcoming at that time. Pursuant to the "brokerage" provision contained in the contract, the $5000 deposit was split between American Sheet Metals and Mahler. The $2500 retained by Mahler remains in an escrow account.

After the forfeiture of the $5000, Camarota again discussed the property with Mahler. He stated that he was still very interested in purchasing the property, and wished to be informed if another serious buyer came forward so he could have one more opportunity to obtain approval of Burndy. Camarota stated that he did not want the property "sold out from under" him. The court found that he, in effect, requested a right of first refusal.

In a letter dated March 31, 1983, Mahler advised the plaintiff that Berco would not be purchasing the property, and that "there is no further responsibility to you from this office." Some days later, the plaintiff and Kenneth Mahler met fortuitously at the Middlebury post office and discussed the March 31 letter. The parties agreed to contact one another if and when Camarota was ready to proceed with the purchase.

In late August or early September, 1983, Kenneth Mahler contacted Camarota to inform him that another party had made an offer to purchase the property. Camarota subsequently obtained the approval of Burndy's board of directors to purchase the property. A new contract was drafted and the closing was held on September 22, 1983. The real estate commission from the transaction was $33,000. Approximately 45 percent of that amount is currently held in escrow pending a resolution of this action.

I

The defendants' first claim is that the court erred in holding that General Statutes § 20-325a, the "real estate commission statute," does not govern an agreement between brokers. They assert that the cobrokerage agreement in the present case is unenforceable because it does not comply with the statute.

General Statutes § 20-325a provides in relevant part that "(a) *No person who is not licensed* under the provisions of this chapter, and who was not so licensed at the time he performed the acts or rendered the services for which recovery is sought, *shall commence or bring any action in any court of this state,* after October 1, 1971, *to recover any commission,* compensation or other payment in respect of any act done or service rendered by him, the doing or rendering of which is prohibited under the provisions of this chapter except by persons duly licensed under this chapter; (b) No person, licensed under the provisions of this chapter, shall commence or bring any action in respect of any acts done or services rendered after October 1, 1971, as set forth in subsection (a), *unless such acts or services were rendered pursuant to a contract or authorization from the person for whom such acts were done or services rendered.* To satisfy the requirements of this subsection any such contract or authorization shall (1) be in writing, (2) contain the names and addresses of all the parties thereto, (3) show the date on which such contract was entered into or such authorization given, (4) contain the conditions of such contract or authorization and (5) be signed by the owner or an agent authorized to act on behalf of the owner only by a written document executed in the manner provided for conveyances in section 47-5, and by the real estate broker or his authorized agent." (Emphasis added.)

The question of whether this statute applies to an agreement between cobrokers is one of first impression for Connecticut appellate courts. In support of their position, the defendants cite language in *Raveis, Inc.* v. *Haines,* 5 Conn. L. Trib. No. 38, p. 9 (Appellate Session of the Superior Court, No. 819) (1979).

In *Raveis,* the underlying action by the plaintiff cobroker sounded in misrepresentation and breach of contract. The trial court found for the defendants because the cobrokerage agreement in question did not comply with General Statutes § 20-325a. In upholding the trial court's action, the Appellate Session of the Superior Court held that § 20-325a "applies to brokers and cobrokers alike." Id. The court in *Raveis* went on to state: "To the legislative intent is clearly expressed in § 20-325a (b) that every action is encompassed and included in the phrase 'any action.' This would include actions based on fraudulent misrepresentation, breach of express contract, joint venture, quasi-contract, implied contract, quantum meruit and the like."

Such an interpretation of General Statutes was overruled, at least in part, by *Holmes* v. *Preferred Properties, Inc.,* 190 Conn. 808, 462 A.2d 1057 (1983). In *Holmes,* the plaintiff was a real estate salesman employed by the defendant Preferred Properties, Inc. While associated with the defendant, the plaintiff induced his friend to list his home with Preferred Properties. The friend signed a listing agreement with the defendant's office, and the plaintiff conducted an open house showing the property. The plaintiff was then discharged by the defendant. Subsequently, the property was sold and the defendant received a commission. The plaintiff brought an action to recover one-half the broker's commission pursuant to his employment contract. The trial court applied the requirements of § 20-325a (b) to the written employment contract between the plaintiff and the defendant and, noting that

the plaintiff's address was absent from the contract, rendered judgment for the defendant. In setting the judgment aside, the Supreme Court reiterated that listing contracts are governed exclusively by § 20-325a. Id., 811. The court found, however, that the employment agreement was separate and distinct from the listing agreement to which the owner and Preferred Properties were parties. "The plaintiff's suit did not depend on the listing agreement. This is not an action for a commission; rather, it is a suit by an employee under an employment contract for a commission paid to his employer. . . . What the plaintiff and defendant really contracted for is not the payment of a commission but a division of the fruits of their joint efforts which come to them from the owner in the shape of a commission." Id., 812–13. Likewise, in the case at bar the plaintiff's suit does not depend upon the listing agreement. This is not an action for a commission, but rather a suit to enforce the cobrokerage agreement by which the plaintiff and the defendant agreed to divide the fruits of their joint efforts.

In *William Pitt, Inc.* v. *Taylor,* 186 Conn. 82, 438 A.2d 1206 (1982), the Supreme Court found error in the trial court's application of the requirements of § 20-325a to a sales contract. The trial court had held that the statute's requirements pertained not only to the listing contract, but also to the sales contract, and that the plaintiffs could not recover a commission without producing a dated contract of sale signed by the defendants. In reversing, the Supreme Court observed that the listing contract was an undertaking separate and apart from the sales contract between a seller and a buyer of real property. The court held that the writing required by § 20-325a pertained only to the listing contract and not to the sales contract. *William Pitt, Inc.* v. *Taylor,* supra, 84. "Implicit in [the *William Pitt*] decision was a rejection of the notion that all contracts

related to real estate must conform to § 20-325a." *Holmes* v. *Preferred Properties, Inc.*, supra, 812.

Finally, in *Dow & Condon, Inc.* v. *Anderson,* Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 0314038 (May 5, 1986), aff'd on other grounds, 203 Conn. 475, 525 A.2d 935 (1987), the trial court was faced with the precise issue of whether § 20-325a applies to a cobrokerage agreement between two real estate brokers. Relying on *William Pitt, Inc.* v. *Taylor,* supra, and *Holmes* v. *Preferred Properties, Inc.,* supra, the court concluded that the contract or writing required under § 20-325a applies to the agreement between the seller and the agent, and has no application to a fee-splitting agreement between the listing broker and a cobroker.

We find the narrowing of the applicability of General Statutes § 20-325a to be logical and justified, especially in light of the legislative history[3] and the statutory language itself. Subsection (b) of the statute provides that no licensed realtor may maintain an action for a commission "unless such acts or services were rendered pursuant to a contract or authorization from the person for whom such acts were done or services rendered. . . . To satisfy the requirements of this subsection any such contract or authorization shall (1) be in writing, (2) *contain the names and addresses of all the parties thereto* . . . (5) be signed by the owner . . . and by the real estate broker . . . ."[4] (Emphasis added.)

---

[3] Several comments were made during hearings and debate to the effect that the statute was enacted specifically to protect the unsophisticated home buyer. See, e.g., comments of Mr. David Kotkin, attorney for the Connecticut Association of Real Estate Boards that "the bill itself is really oriented to the single family house owner who might be confused by the listing of property . . . ." Conn. Joint Standing Committee Hearings, Insurance and Real Estate, Pt. 1, 1971 Sess., p. 230.

[4] The defendants refer us to the 1984 and 1985 amendments to General Statutes § 20-325a. The amendments changed the language of subsection

The contract referred to in the statute must be "from the person for whom such acts were done or services rendered." It is not a logical interpretation to assume that this language refers to a listing broker retaining a cobroker. Statutes must be interpreted rationally. *Gentry* v. *Norwalk,* 196 Conn. 596, 606, 494 A.2d 1206 (1985); *Maciejewski* v. *West Hartford,* 194 Conn. 139, 151–52, 480 A.2d 519 (1984). The rational interpretation is that the statutory language refers to the listing broker and the seller of the property entering into a standard listing agreement. See also annot., 44 A.L.R.2d 761; 12 Am. Jur. 2d, Brokers § 176.

In light of the case law on General Statutes § 20-325a and the language of the statute itself, we conclude that the trial court correctly held that an agreement between brokers is not subject to the requirements of the statute.

(b) (5) from "be signed by the parties" to "be signed by the owner or an agent authorized to act on behalf of the owner only . . . and by the real estate broker or his authorized agent." The defendants assert that we must consider the statute as it was written before the amendments, as the acts took place before the amendments were made to the statute, and all amendments are to be applied only prospectively. See *Nagle* v. *Wood,* 178 Conn. 180, 187–88, 423 A.2d 875 (1979).

An amendment which in effect only clarifies a prior statute, however, must be accepted as the legislative meaning of the original act. *Shelton* v. *Commissioner,* 193 Conn. 506, 514, 479 A.2d 208 (1984); *State* v. *McKenna,* 11 Conn. App. 122, 131, 525 A.2d 1374 (1987). In the present case, the legislative history makes it evident that the amendments were only clarifications of the original statutory intent and therefore should be considered as though part of the original act. See comments of Rep. Morag Vance, 28 H.R. Proc., Pt. 10, 1985 Sess., pp. 3695–96, that this is "the real estate listing agreement [statute]. We're trying to get the language clean and green for a change," and "this is only a non-substantive, technical change to clean up the language [of the bill]." See also comments of Mr. Henry Maguire, Vice President of the Connecticut Association of Realtors, Conn. Joint Standing Committee Hearings, Insurance and Real Estate, Pt. 1, 1985 Sess., pp. 70–71; to the effect that these amendments are a "technical clarification of the little problems we've run into in the interpretation" of the statute. We therefore consider the statute in its amended form.

## II

The defendants' second claim is that the court erred in concluding that the sale of this commercial property to Burndy was not a "new deal," and that therefore the obligation of the defendants under the cobrokerage agreement continued until the date of the closing.

"Our review of the trial court's factual findings is limited solely to a determination of whether they are clearly erroneous. Practice Book § 4061 (formerly § 3060D); *Fortier* v. *Laviero,* 10 Conn. App. 181, 183, 522 A.2d 313 (1987) . . . ." (Citation omitted.) *Rocklen, Inc.* v. *Radulesco,* 10 Conn. App. 271, 276, 522 A.2d 846 (1987). The trial court found that the cobrokerage agreement was not terminated "by the forfeiture of the $5000 deposit [or] by the defendant's letter of March 31, 1983." The court relied upon the following facts in coming to its conclusion. The plaintiff and Mahler met, after the March 31 letter, and had a discussion that suggested the agreement was still in effect. Further, after Burndy initially stated that it would not purchase the property, Camarota asked for a right of first refusal on the property. When another prospective purchaser appeared, Mahler contacted Camarota to allow him to exercise his right of first refusal. He did exercise that right, and the sale was consummated.

Moreover, although the defendant attempts to distinguish between Berco and Burndy, the cobrokerage agreement makes it evident that the sale could be made to either entity. We conclude that there was sufficient evidence upon which the court could have found the agreement to be in effect at the time of the sale of the property.

As we have found that there was a valid cobrokerage agreement between the plaintiff and the defend-

ants, and that it was not necessary for that agreement to comply with General Statutes § 20-325a, we conclude that the court did not abuse its discretion in rendering judgment for the plaintiff.

There is no error.

In this opinion the other judges concurred.