**SOTHEBY'S INTERNATIONAL REALTY, INC., Plaintiff,**

v.

**The RELOCATION GROUP, LLC and Peter Rosato, Defendants.**

**Civil Action No. 12–01322–WGY.**

United States District Court, D. Connecticut.

Dec. 9, 2013.

Kathleen M. Scanlon, Law Offices of Kathleen M. Scanlon, PLLC, New York, NY, Thomas E. Crosby, Crosby Law Firm, LLC, Guilford, CT, for Plaintiff.

John R. Harness, Law Office of John R. Harness, Stamford, CT, for Defendants.

*MEMORANDUM AND ORDER*

YOUNG,[1] District Judge.

## I. INTRODUCTION

Sotheby's International Realty, Inc. ("Sotheby's") brings this suit against The Relocation Group, LLC ("The Relocation Group") and its part owner, Peter Rosato (collectively, the "Defendants"), seeking vacatur of an award issued by a panel of arbitrators to The Relocation Group following a dispute over the commission on a sale of property. Specifically, Sotheby's contends that because The Relocation Group did not have an in-force representation agreement with the buyer of the property at the time of the sale, and because Sotheby's did have a valid representation agreement and listing agreement with the buyer and seller, respectively, The Relocation Group cannot bring an action to recover a commission under Connecticut General Statutes section 20–325a ("Section 20–325a" or the "statute"), which sets forth the requirements necessary to bring such an action. The Relocation Group has filed a cross-motion to confirm the arbitration award. The questions to be resolved here are (1) whether The Relocation Group complied with Section 20–325a, even though its buyer representation agreement had expired; and (2) if not, whether the panel of arbitrators granted the award in manifest disregard of the law.[2]

### A. Procedural Posture

On September 13, 2012, Sotheby's filed a verified petition to vacate an arbitration award in the District of Connecticut. Verified Pet. Vacate Arbitration Award ("Sotheby's Pet."), ECF No. 1. The Relocation Group cross-moved for an order to confirm the arbitration award on October 31, 2012, appending to its motion a memorandum of law in support.[3] Cross–Mot.

---

1. Sotheby's originally advanced three other arguments in support of vacatur of the arbitration award, *see* Verified Pet. Vacate Arbitration Award 2, ECF No. 1, but it has since agreed to "narrow[ ] its vacatur request to manifest disregard of the law grounds because of its primacy to all other issues," Mem. Law Supp. Pet. Vacate/Opp'n Mot. Confirm 2 n. 1, ECF No. 26.

2. The Relocation Group originally moved to dismiss Sotheby's petition, Mot. Dismiss, ECF No. 9, but this motion was later withdrawn, Mot. Withdraw, ECF No. 21, apparently because it was replaced by the present cross-motion.

3. Specifically, under the FAA, a court is empowered to vacate an arbitral award:

 (1) where the award was procured by corruption, fraud, or undue means;
 (2) where there was evident partiality or corruption in the arbitrators, or either of them;
 (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
 (4) where the arbitrators exceeded their powers, or so imperfectly executed them

Order Confirm Arbitration Award, ECF No. 17; Mem. Law Supp. Mot. Confirm Arbitration Award ("Relocation Grp.'s Mem."), ECF No. 18. Sotheby's submitted an opposition to The Relocation Group's cross-motion on November 16, 2012. Mem. Law Supp. Pet. Vacate/Opp'n Mot. Confirm ("Sotheby's Opp'n"), ECF No. 26. On December 5, 2012, the Defendants filed a reply to Sotheby's opposition. Reply Mem. Law Opp'n Pet. Vacate Arbitration Award & Supp. Mot. Confirm ("Defs.' Reply"), ECF No. 32. Nine days later, Sotheby's filed a sur-reply to the Defendants' reply. Reply Mem. Law Further Supp. Pet. Vacate & Opp'n Mot. Confirm, ECF No. 34.

## B. Facts

Sotheby's and The Relocation Group offer real estate brokerage services and count themselves as members of two real estate trade associations, the Greenwich Association of Realtors (the "GAR") and the National Association of Realtors (the "NAR"). *See* Sotheby's Pet. ¶ 9. Pursuant to an arrangement between Sotheby's and Maria Allwin ("Allwin"), the owner of a property located at 65 Upper Cross Road in Greenwich, Connecticut (the "Upper Cross Property"), Sotheby's listed the Upper Cross Property for sale on the Greenwich Multiple Listing Service (the "GMLS"). *See id.* ¶ 10; *Sotheby's Int'l Realty, Inc. v. Relocation Group, LLC,* No. FSTCV116011784S, 2012 WL 1511375, at *1 (Conn.Super.Ct. Apr. 4, 2012) (Jennings, J.). The listing agreement set out, among other things, Sotheby's commitment to give 2.5 percent of the sales price (the "buyer-side commission") to any cooperating broker that may represent the

eventual purchaser of the Upper Cross Property. *See* Sotheby's Pet. ¶ 11.

On October 19, 2010, The Relocation Group entered into an agreement with Amy Kauffman ("Kauffman") to serve as Kauffman's exclusive brokerage representative for any real estate transactions in the Greenwich area in which she might engage as a buyer. *See id.* ¶ 13; Sotheby's Pet., Ex. A, Exclusive Agency Right Represent Buyer Tenant Authorization ("Relocation Grp.'s Exclusive Buyer Representation Agreement"), ECF No. 1–2. This buyer representation agreement was originally set to be in effect from October 10, 2010, until December 31, 2010, but a manual revision to the agreement apparently extended the term of The Relocation Group's representation to June 30, 2011. *See* Sotheby's Pet. ¶ 13; Relocation Grp.'s Exclusive Buyer Representation Agreement § III, at 1. As is customary, the agreement included a provision that imposed upon Kauffman an obligation to pay to The Relocation Group a professional service fee—in this case, five percent of the purchase price—in the event that, during the course of The Relocation Group's representation, she entered into a contract to purchase, or was introduced to a property she subsequently leased to which she eventually obtained title. *See* Relocation Grp.'s Exclusive Buyer Representation Agreement § VII(1)(a), (c)(i)-(iii), at 2. The provision, however, contained an additional clause providing that "no fee will be due and payable . . . if [Kauffman] sign[s] an exclusive agreement or authorization with another real estate broker after the expiration of this Authorization." *Id.* § VII(1)(c)(iii), at 2.

On August 19, 2011, Sotheby's negotiated its own exclusive buyer representation

that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a)(1–4).

agreement with Kauffman and her husband (collectively, the "Kauffmans"). *See* Sotheby's Pet., Ex. B, Exclusive Right Represent Buyer/Tenant Agreement ("Sotheby's Exclusive Buyer Representation Agreement"), ECF No. 1–3. Unlike The Relocation Group's agreement, though, Sotheby's agreement contained a procurement-protection clause, which noted that Sotheby's authorization to represent the Kauffmans was "in effect from 8/19/2011 to 8/31/2011, inclusive, or through the closing date of a pending transaction wherein [Sotheby's] represents [the Kauffmans]." Sotheby's Pet. ¶ 14; Sotheby's Exclusive Buyer Representation Agreement 1. The agreement also expressly allowed Sotheby's to become a dual agent, meaning that Sotheby's could represent both buyers looking for properties and sellers with whom Sotheby's had a listing agreement. Sotheby's Exclusive Buyer Representation Agreement 1.

Around August 26, 2011, Allwin agreed to sell the Upper Cross Property to Kauffman for $16,000,000 and memorialized the deal in a residential real estate sales agreement (the "Sales Agreement"), which was signed by both parties. Sotheby's Pet. ¶ 15; Sotheby's Pet., Ex. C, Fairfield Cnty. Bar Ass'n Residential Real Estate Sales Agreement ("Sales Agreement"), ECF No. 1–4. Sotheby's name was listed alone in the Sales Agreement as the broker responsible for negotiating the sale of the Upper Cross Property. Sotheby's Pet. ¶ 15; Sales Agreement ¶ 9.

On September 16, 2011, The Relocation Group gave notice of its intent to claim a $400,000 broker's lien on the Upper Cross Property—representing 2.5 percent of the property's gross sales price—because, it alleged, it was the procuring cause of the sale of the Upper Cross Property and was therefore due the buyer-side commission for its efforts. *See* Sotheby's Pet. ¶ 16;

Sotheby's Pet., Ex. D, Notice Intent Claim Lien Real Estate Broker Pursuant C.G.S. § 20–325a(r), ECF No. 1–5. Just five days later, Sotheby's provided notice of its own intent to claim a broker's lien of $720,000 on the Upper Cross Property— representing 4.5 percent of the property's gross sales price—for the full commission, given its allegedly exclusive representation of both the buyer and the seller. *See* Sotheby's Pet. ¶ 17; Sotheby's Pet., Ex. E, Notice & Claim Broker's Lien, ECF No. 1–6.

Kauffman fulfilled her commitment to purchase the Upper Cross Property on October 12, 2011, but because the broker's liens had not yet been released, the parties could not finalize the sale. Sotheby's Pet. ¶¶ 18–19. As a result, Allwin paid Sotheby's a commission for its representation of her in the sale of the Upper Cross Property, but placed the amount reserved for the buyer-side commission into an escrow account (which could be released only after the rights of the parties had been determined definitively). *Id.* ¶ 20. On or about October 18, 2011, Sotheby's initiated an interpleader action in the Connecticut Superior Court (the "Superior Court"), seeking the release of the buyer-side commission funds held in escrow. *Id.* ¶ 20 n. 1; *see also* Rosato Aff., Ex. A, Compl. Interpleader, ECF No. 19–1. Around March 23, 2012, the Defendants filed an arbitration action against Sotheby's and its CEO, after previously requesting that the Superior Court compel arbitration and seeking the buyer-side commission under a procuring-cause theory. Sotheby's Pet. ¶ 21; *see also Sotheby's,* 2012 WL 1511375, at *4. The Superior Court stayed the case on April 4, 2012, ruling that the GAR's bylaws and the NAR's bylaws and Code of Ethics compelled arbitration of the parties' dispute. *See* Sotheby's Pet. SI 20 n. 1; *Sotheby's,* 2012 WL 1511375, at *7–8.

On July 11, 2012, a three-person panel from the GAR (the "Panel") found against Sotheby's, awarding $400,000 to The Relocation Group. Sotheby's Pet., Ex. F, Award Arbitrators ("Arbitration Award"), ECF No. 1–7. In accordance with NAR procedure, the Panel did not provide any written rationale for the award. *See id.;* Aff. Supp. Mot. Confirm Arbitration Award/Opp'n Pet. Vacate 5 ("NAR Rules"), ECF No. 33 (instructing that an arbitral award "shall be in writing and signed by the arbitrators or a majority of them, and shall state only the amount of the award"). Sotheby's sought a procedural review of the award on July 31, 2012, Sotheby's Pet. ¶ 26; *see also* Sotheby's Pet., Ex. G, Basis Request Due Process Review, ECF No. 1–8, which the GAR denied on or around September 12, 2012, Sotheby's Pet. ¶ 29. Shortly thereafter, Sotheby's withdrew its interpleader action and filed suit in the District of Connecticut. *See id.* ¶¶ 20 n. 1, 30; Relocation Grp.'s Mem. 2.

## II. ANALYSIS

### A. Standard of Review

 Arbitral awards, and the process by which they are generated, are due sig-

nificant deference by the judiciary. *Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC,* 497 F.3d 133, 138 (2d Cir.2007). A petition to vacate "is not an occasion for *de novo* review of an arbitral award." *Wallace v. Buttar,* 378 F.3d 182, 189 (2d Cir.2004). Thus, a court is duty-bound to grant a motion to confirm an arbitration award so long as there exists "a barely colorable justification for the outcome reached," even if the court itself would have come to an alternative conclusion had it been given the opportunity to pass judgment on the matter in the first instance. *Parnell v. Tremont Capital Mgmt. Corp.,* 280 Fed.Appx. 76, 76 (2d Cir.2008) (quoting *Landy Michaels Realty Corp. v. Local 32B–32J, Serv. Emps. Int'l Union, AFL–CIO,* 954 F.2d 794, 797 (2d Cir.1992)) (internal quotation marks omitted).

 The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16, however, sets forth four grounds upon which a federal court, prompted by any party to an arbitration, may overturn an arbitral award.[4] *See id.* § 10(a)(1–4). The Second Circuit, for its part, has long recognized a fifth avenue of attack: where the arbitrator's decision was rendered in manifest disregard of the law.[5] *See, e.g., Giller v. Ora-*

---

4. *Hall Street Assocs., L.L.C. v. Mattel, Inc.,* 552 U.S. 576, 584, 128 S.Ct. 1396, 170 L.Ed.2d 254 (2008), in which the Supreme Court held the FAA's statutorily enumerated grounds for vacatur of arbitral awards to be exhaustive, initially appeared to call into question the vitality of the manifest-disregard doctrine. *See T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.,* 592 F.3d 329, 339–40 (2d Cir.2010). Since the advent of *Hall Street,* however, the Second Circuit has interpreted manifest disregard to be a mere "judicial gloss" on the provisions found within 9 U.S.C. section 10. *Id.* at 340 (quoting *Stolt–Nielsen SA v. AnimalFeeds Int'l Corp.,* 548 F.3d 85, 94 (2d Cir.2008), *rev'd on other grounds,* 559 U.S. 662, 130 S.Ct. 1758, 176 L.Ed.2d 605 (2010)); *accord Schwartz v. Merrill Lynch & Co., Inc.,* 665 F.3d 444, 451–52 (2d Cir.2011). The

Supreme Court has expressly declined to temper the Second Circuit's appraisal. *See Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.,* 559 U.S. 662, 672 n. 3, 130 S.Ct. 1758, 176 L.Ed.2d 605 (2010) ("We do not decide whether 'manifest disregard' survives our decision in [*Hall Street* ] as an independent ground for review or as a judicial gloss on the enumerated grounds for vacatur set forth at 9 U.S.C. § 10.").

5. Subsection (a) of Section 20–325a is not in issue because, from the facts presented, both parties appear to be duly licensed brokers. *See* Conn. Gen.Stat. § 20–325a(a) (prohibiting the recovery of commissions for any persons who are "not licensed under the provisions of this chapter"). Subsection (c) of the statute is also not implicated here because the buyer-

*cle USA, Inc.*, 512 Fed.Appx. 71, 72 (2d Cir.2013), *cert. denied,* —— U.S. ——, 134 S.Ct. 531, 187 L.Ed.2d 394 (2013). Under the manifest-disregard standard, however, a court's role in reconsidering an arbitrator's decision is "severely limited." *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 389 (2d Cir. 2003) (quoting *In re Arbitration No. AAA13–161–0511–85 Under Grain Arbitration Rules*, 867 F.2d 130, 133 (2d Cir. 1989)) (internal quotation marks omitted). What is more, the party requesting vacatur on manifest-disregard grounds shoulders the weighty burden of demonstrating an arbitral award's fallibility by reason of its inconsistency with prevailing legal principles. *See id.* An arbitrator's mere commission of error in understanding the relevant law, or her reasonably disputed

interpretation of the meaning and applicability of said law to the issues presented, does not rise to the level of manifest disregard. *Giller*, 512 Fed.Appx. at 73. Rather, this method of vacatur is available "only [in] those exceedingly rare instances where some egregious impropriety on the part of the arbitrator[ ] is apparent." *Duferco*, 333 F.3d at 389.

**B. Section 20–325a's Statutory Scheme and The Relocation Group's Noncompliance**

■■■ Section 20–325a establishes a series of preconditions that a broker must fulfill before she can bring an action to recover a commission arising out of a real estate transaction. The two provisions most relevant to the present inquiry are subsections (b) and (d) of the statute.[6]

---

side commission over which the parties are in dispute relates to the sale of a residential, not a commercial, property. *See id.* § 20–325a(c) (setting forth an exception for "acts done or services rendered ... in a commercial real estate transaction"). The remainder of Section 20–325a deals simply with rules governing broker's liens and exceptions concerning certain classes of unlicensed individuals and the representation of government-related entities. *See id.* § 20–325a(e-r).

**6.** The Relocation Group's secondary threshold contentions—namely, (1) that Section 20–325a is inapplicable to arbitration proceedings, *see* Defs.' Reply at 13–14; and (2) that arbitration rules specifically stated that arbitral awards could not be subject to appeal to the courts, *see id.*—are entirely without merit and need only take a brief moment of the Court's time to address.

In support of its first argument, The Relocation Group claims that subsection (b) of Section 20–325a pertains only to actions brought by licensed brokers in court. *Id.* Admittedly, subsection (a) of the statute bars unlicensed brokers from "commenc[ing] or bring[ing] *any action in any court* [in Connecticut]." Conn. Gen.Stat. § 20–325a(a) (emphasis added). Such restrictive language, however, is not present in subsection (b). *See id.* § 20–325a(b) ("No person, licensed under the pro-

visions of this chapter, shall commence or bring any action with respect to any acts done or services rendered ...."). The jurisprudence of other courts having occasion to wrestle with subsections (a) and (b) suggests that the particular terms used in these provisions dictate their respective scopes. *See, e.g., Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 400 (2d Cir.2001) (acknowledging the linguistic—and, by extension, legal—dissimilarities that distinguish subsection (a) from subsection (b)); *Wilder Grp., Inc. v. Byers*, No. CV94 0536062, 1995 WL 127877, at *7 (Conn.Super.Ct. Mar. 14, 1995) (Sheldon, J.) ("Unlike subsection (b), subsection (a) contains no language specifically suggesting that its scope is limited to listing agreements between brokers and property sellers. To the contrary, it expressly bars *any* suit to recover a commission by *any* person not licensed under Chapter 392 for *any* act done or service rendered for which a valid Connecticut real estate license is required.... Indeed, in the absence of qualifying language in the statute, subsection (a) must be read to bar fee-recovery lawsuits for unlicensed brokerage activity of every kind and description for which a valid Connecticut broker's license is required. This, then, is necessarily broad enough to include the unlicensed rendering of services as a non-listing co-broker, finding a buyer for another broker's listed property.").

Subsection (b) precludes licensed ·brokers from initiating actions to recover commissions for brokerage services unless such services were performed "pursuant to a contract or authorization from the person for whom the ... services [were] rendered." Conn. Gen.Stat. § 20–325a(b). The contract or authorization must:

(1) Be in writing, (2) contain the names and addresses of the real estate broker performing the services and the name of the person or persons for whom the acts were done or · services rendered, (3) show the date on which such contract was entered into or such authorization given, (4) contain the conditions of such contract or authorization, (5) be signed by the real estate broker or the real ·estate broker's authorized agent, (6) if such contract or authorization pertains to any real property, include the following statement: "THE REAL ESTATE BROKER MAY BE ENTITLED TO CERTAIN LIEN RIGHTS PURSUANT TO SECTION 20–325a OF THE CONNECTICUT GENERAL STATUTES", and (7) be signed by the person or persons for whom the acts were done or services rendered or by an agent authorized to act on behalf of such person or persons, pursuant to a written document executed in the manner provided for conveyances in section 41–5, except, if the acts to be done or services rendered involve a listing contract for the sale of land containing any building or structure occupied or intended to be occupied by no more than four families, the listing contract shall be signed by the owner of the real estate or by ·an agent authorized to act on behalf of such owner pursuant to a written document executed in the manner provided for conveyances in section 47–5.

*Id.* Subsection (d), however, carves out an exception whereby a broker need not comply strictly with these requirements:

(d) Nothing in· ... subdivisions (2) to (7), inclusive, of subsection (b) of this section ... shall prevent any licensee from recovering any commission, compensation or other payment with respect to any acts done or services rendered, if it would be inequitable to deny such recovery and the licensee ... has substantially complied with subdivisions (2) to (7), inclusive, of subsection (b) of this section ....

*Id.* § 20–325a(d). In other words, a broker. who would otherwise be prohibited from launching a recovery action is nevertheless permitted to bring such an action if "(1) there has been substantial compliance with the requirements relevant to the transaction; and (2) the facts and circumstances of [the] case would make it inequitable to deny recovery." *Location Realty, Inc. v. Colaccino,* 287 Conn. 706, 719, 949 A.2d 1189 (2008).

■ Before the Court can answer whether The Relocation Group complied

In support of its second argument, The Relocation Group points to the NAR's rules, which state that arbitral awards "shall not be subject to review or appeal" and that "[n]otwithstanding the foregoing, a party may appeal to the Board of Directors only on the basis of alleged irregularity(ies) of the proceeding as may have deprived the party of fundamental due process," NAR Rules 5. Defs.' Reply 13–14. Privately agreed-upon terms, however, cannot function to deprive a district court of its authority under the FAA to assess the propriety of an arbitral award. *See Rollins, Inc. v. Black,* 167 Fed.Appx. 798, 799 n. 1 (11th Cir.2006) (per curiam) ("A 'binding, final, and non-appealable' arbitral award does not mean the award cannot be reviewed. It simply means the parties have agreed to relinquish their right to appeal the merits of their dispute; it does not mean the parties relinquish their right to appeal an award resulting from an arbitrator's abuse of authority, bias, or manifest disregard of the law.").

with Section 20–325a, it must first tackle The Relocation Group's primary and most formidable threshold contentions that Sotheby's and The Relocation Group had a cobrokerage agreement in connection with the Upper Cross Property, and that Section 20–325a does not apply to such arrangements.[7] *See* Defs.' Reply 5–11. The Relocation Group's argument rests largely upon three cases that stand for the proposition that agreements between cooperating brokers need not conform to the extensive and rather onerous requirements of Section 20–325a. *See* Defs.' Reply 5–11 (citing *Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 400 (2d Cir.2001); *Holmes v. Preferred Properties, Inc.*, 190 Conn. 808, 812–13, 462 A.2d 1057 (1983); *Conda v. Christensen*, 11 Conn.App. 557, 561–64, 528 A.2d 1159 (1987)).

■ The Relocation Group misses a crucial distinction between those cases and

---

**7.** The Relocation Group is not the first to err in interpreting the scope of Section 20–325a's coverage, however. Before Section 20–325a underwent a major overhaul in 1994, much confusion arose out of a latent ambiguity in the statutory language—specifically, that which was resident in the phrase "pursuant to a contract or authorization *from the person for whom the ... services [were] rendered*," Conn. Gen.Stat. § 20–325a(b) (emphases added)—which strongly suggested that Section 20–325a pertained only to brokers acting at the behest of a *seller*, not a buyer. *See Conda*, 11 Conn.App. at 564, 528 A.2d 1159 ("The contract referred to in the statute must be 'from the person for whom such acts were done or services rendered.' It is not a logical interpretation to assume that this language refers to a listing broker retaining a cobroker.... The rational interpretation is that the statutory language refers to the listing broker and the seller of the property entering into a standard listing agreement."). This confusion was compounded by the fact that the term "listing agreement" is generally used in reference to broker-seller arrangements. *See Black's Law Dictionary* 950–51 (8th ed. 2004) (defining "listing agreement" as "[a]n agreement between a *property owner* and an agent, whereby the agent agrees to try to secure a buyer or tenant for a specific property at a certain price and terms in return for a fee or commission" (emphasis added)).

A little legislative history goes a long way toward clarifying the meaning behind Section 20–325a. To understand why, one need only look to subsection (b)(7) of the statute. As stated above, the text of this provision presently reads as follows: "To satisfy the requirements of this subsection any contract or authorization shall ... (7) be signed by the person or persons for whom the acts were done or services rendered or by an agent authorized to act on behalf of such person or persons ...." Conn. Gen.Stat. § 20–325a(b)(7). Prior to the amendments of 1994, however, the provision was codified at subsection (b)(5) and read: "To satisfy the requirements of this subsection any ... contract or authorization shall ... (5) be signed by the owner or an agent authorized to act on behalf of the owner ...." 1993 Conn. Legis. Serv. sec. 1, § 20–325a(b)(5). By itself, the change in form hardly seems meaningful. The Public Act Summaries, produced by Connecticut's Office of Legislative Research, do the work of revealing the genuine intent of the Connecticut General Assembly in revising the text, however:

> By law, real estate brokers and agents may recover commissions for acts or services rendered only when they are performed pursuant to a written contract. Under prior law, one of the requirements of the contract was that it be signed by the agent and contain the name and signature of the owner or the owner's authorized agent. The act, instead, requires that the contract contain the name and signature of the person or persons for whom the acts were done or services rendered. *The change recognizes that agents may represent buyers as well as sellers of real estate.*

1994 Conn. Pub. Act Summaries (emphasis added), *available at* http://search.cga.state.ct.us/dtsearch.asp?cmd=getdoc&DocId=14011&Index=I% 3a:*zindex*1994&HitCount=0&hits=&hc=0&req=&Item=1751.

In this way, the most recently modified version of subsection (b)(7) not only acknowledges the importance of broker-buyer arrangements to the real estate transactional system, but also confirms that broker-buyer arrangements are clearly contemplated in Section 20–325a's commission-recovery scheme.

the one at bar: none of the suits in the former relied upon a *listing* agreement for their foundation. *See Fieger*, 251 F.3d at 398–402 (dealing only with the application of Section 20–325a to a commission-recovery claim by an unlicensed financial advisor, making no mention of a listing agreement); *Holmes*, 190 Conn. at 812, 462 A.2d 1057 (deeming Section 20–325a inapplicable to an action on an employment agreement brought by a real estate salesman against his employer for commissions obtained by the employer because "[the] employment agreement was separate and apart from the listing agreement to which [the seller] and the defendant were parties" and "[t]he [salesman's] suit did not depend on the listing agreement"); *Conda*, 11 Conn.App. at 564, 528 A.2d 1159 (determining that a cobrokerage agreement, in which a listing broker separately retained a cobroker, need not conform to Section 20–325a). It is well settled that Section 20–325a pertains to listing agreements and listing agreements alone. *See William Pitt, Inc. v. Taylor*, 186 Conn. 82, 84, 438 A.2d 1206 (1982) ("The writing required by [Section] 20–325a pertains only to the listing contract and not to the sales contract."). While independently negotiated cobrokerage agreements do not fall within the jurisdictional ambit of Section 20–325a, *see Conda*, 11 Conn.App. at 564, 528 A.2d 1159, it would seem that open-to-all, fee-splitting arrangements established via a *multiple listing service*, by which listing brokers and cooperating brokers are only informally associated, do, *cf. Stortroen v. Beneficial Fin. Co. of Colo.*, 736 P.2d 391,

396–400 (Colo.1987) (en banc) ("The well-defined relationship that can be traced from the seller to the listing broker and then to the selling broker or salesperson leads us to conclude that in a typical multiple listing real estate transaction the selling ('cooperating') broker or salesperson functions as an agent of the listing broker and, consequently, stands in a subagency relationship to the seller"); *cf. also Becker v. Badash*, No. CV86 0080652, 1987 WL 108958, at *2–4 (Conn.Super.Ct. Nov. 23, 1987) (Lewis, J.) (adopting in whole part the cooperating broker subagency theory articulated in *Stortroen*, 736 P.2d 391).

Here, The Relocation Group's claim for recovery of a commission from the sale of the Upper Cross Property is derived entirely from the listing agreement posted by Sotheby's on the GMLS. *See Sotheby's*, 2012 WL 1511375, at *2 ("[The Relocation Group] has not filed its complaint in interpleader, but the Escrow Agreement between the parties recites in the fourth 'whereas' clause that both [Sotheby's] and [The Relocation Group] are each claiming entitlement to the 'buy side' commission of 2.5% of the [$16 million] purchase price .... This indicates to the court that [The Relocation Group] *is not* seeking the 5% commission specified in its 'buy side' agreement with the purchaser ..., but *is* claiming the 2.5% commission offered by [Sotheby's] in its GMLS listing to the 'cooperating broker' in a sale." (fourth alteration in original) (emphases added)). As a result, it cannot circumvent the requirements of Section 20–325a.[8] *Cf. Holmes*,

---

**8.** Indeed, most of the cases interpreting this provision have dealt exclusively with the presence *vel non* of conditions that sufficiently concretize certain of the agreement's essential terms. *See, e.g., Storm Assocs., Inc. v. Baumgold*, 186 Conn. 237, 244, 440 A.2d 306 (1982) (observing that, "[f]or the listing contract, it suffices to identify the property being offered for sale and the price at which it is to be

listed"); *cf., e.g., Tyler E. Lyman, Inc. v. Nineteen Thames St. P'ship*, No. 566501, 2004 WL 1098809, at *2 (Conn.Super.Ct. Apr. 29, 2004) (Hurley, J.) (concluding that the inclusion of the text "The terms of the Listing Agreement provided ..." in a broker's revised complaint, filed in connection with a commission-recovery action, satisfied subsec-

190 Conn. at 812–13, 462 A.2d 1057 ("Herein, the plaintiff, a former employee real estate salesman of the defendant real estate agency, brought suit on an employment agreement between the plaintiff and the defendant seeking a share of commissions already paid to the defendant.... This is not an action for a commission; rather, it is a suit by an employee under an employment contract for a commission paid to his employer.... What the plaintiff and the defendant really contracted for is not the payment of a commission but a division of the fruits of their joint efforts which come to them from the owner in the shape of a commission.").

■ Having determined that Section 20–325a governs The Relocation Group's commission-recovery action, this Court now turns to the question of whether The Relocation Group complied, either strictly or substantially, with Section 20–325a. All told, it strictly complied with all but one of the enumerated prerequisites listed in Section 20–325a: subsection (b)(4), which mandates that a licensed broker's contract or authorization to represent an individual in a real estate transaction "contain the conditions of such contract or authorization." Conn. Gen.Stat. § 20–325a(b)(4). In confession, this memorandum acknowledges that the text of subsection (b)(4) facially requires only the existence of a written representation agreement that

simply "contains" the conditions of such representation.[9] Yet an adherence to such a literal reading of subsection (b)(4) would produce a definitively absurd result: a broker who failed to *include* the conditions of her representation in her representation agreement would be barred from collecting a commission from a sale of real property, but a broker who included said representational conditions but nevertheless failed to *comply* with them would be free and able to commence a recovery action. Other Connecticut courts have rejected this excessively narrow conception of the statutory language, implicitly appreciative of the irony in outcome to which such an interpretation gives rise. *See, e.g., Howland v. Schweir,.* 7 Conn.App. 709, 715, 510 A.2d 215 (1986) (holding that the passing of a thirty-day window in which to sell a property disallowed a broker from seeking a commission because "he was required to prove, not only that the agreement complied with General Statutes § 20–325a(b), *but also that his services were rendered pursuant to the terms of that agreement*" (emphasis added)); *All Star Realty, Inc. v. Carriero,* No. FSTCV116011423S, 2012 WL 1088104, at *2 (Conn.Super.Ct. Mar. 5, 2012) (Tobin, J.) (reasoning that a plaintiff broker was unable to state a cause of action for breach of contract because "the legible terms of the listing agreement appear[ed] to provide that the plaintiff is

---

tion (b)(4) (internal quotation marks omitted)).

9. Sotheby's cites the absence of explanation for the arbitral award as further evidence of the Panel's misapplication of Section 20–325a. Sotheby's Opp'n 25–26. The Relocation Group maintains that NAR Code of Ethics and Arbitration Manual rules mandated that arbitral awards provide only the monetary amount of the award and that this cannot be used to show that the Panel acted in manifest disregard of the law. *See* Defs.' Reply 11–13. It is true, as The Relocation Group suggests, that arbitrators are under no general obligation to provide reasons for their awards. *Id.* at 12–13 (citing *Halligan v. Piper Jaffray, Inc.,* 148 F.3d 197, 203–04 (2d Cir. 1998)). Even so, any justification that could have been proffered by the Panel would have had to reconcile its award with Section 20–325a's requirement that brokers comply with the conditions of their representation agreements before bringing a commission-recovery action. Given this memorandum's earlier discussion, *see supra* section II.B, it is difficult to see how the Panel would have been reasonably able to square the two.

only entitled to receive a commission if it procured a buyer/tenant for the defendant's property during the term of the listing agreement ... or within three months of its termination" and because the plaintiff failed to do so in the requisite time period); *Scalzo Realty, Inc. v. Russi*, No. 30 75 85, 1992 WL 154422, at *1 (Conn.Super.Ct. June 23, 1992) (Fuller, J.) (ruling that, despite an oral extension of the representation term in a listing agreement, a broker could not seek recovery of a commission after the agreement's expiration because, *inter alia*, "[t]he expiration date was a *condition* of the original written listing" (emphasis added)).

With regard to the instant dispute, The Relocation Group's term of authorization lapsed on June 30, 2011, nearly two months before Sotheby's entered into its exclusive buyer representation agreement with the Kauffmans. *Compare* Sotheby's Pet. ¶ 13, *with id.* ¶ 14. Moreover, The Relocation Group's buyer representation agreement explicitly waived the right to collect a fee if Kauffman contracted exclusively with another broker outside of The Relocation Group's authorized term. Relocation Grp.'s Exclusive Buyer Representation Agreement § VII(1)(c)(iii), at 2 ("[N]o fee will be due and payable ... if [Kauffman] sign[s] an exclusive agreement or authorization with another real estate broker after the expiration of this Authorization."). Barring a second extension of or a modification to the expiration date found within The Relocation Group's agreement with Kauffman, The Relocation Group cannot state a rightful claim to a commission.

■ The Relocation Group can take no asylum in the substantial-compliance exception inscribed in subsection (d) of Section 20–325a, either. Even if this Court were to treat The Relocation Group as nevertheless in substantial compliance with Section 20–325a, The Relocation Group must show that a denial of recovery would be inequitable. *See Location Realty*, 287 Conn. at 719, 949 A.2d 1189. The inability to collect a commission when the underlying contract giving rights to such collection is no longer in effect hardly rises to the level of inequity needed to trigger the exceedingly limited exception embedded in subsection (d).

## C. The Panel's Decision Was in Manifest Disregard of the Law

■ In determining whether an arbitrator acted in manifest disregard of the law, courts are directed to answer the following three questions: (1) whether the purportedly disregarded law was "clear, and in fact explicitly applicable to the matter before the arbitrators"; (2) whether the law was "in fact improperly applied, leading to an erroneous outcome"; and (3) whether the arbitrator subjectively "kn[ew] of [the law's] existence, and its applicability to the problem before him." *Duferco*, 333 F.3d at 390.

The first and second of the aforementioned inquiries are simple enough to resolve rather quickly. As mentioned above, *see supra* section II.B, Section 20–325a governs the instant commission-recovery dispute. As to its scope of coverage, the statute was quite clear, yet the Panel, through its own fault or otherwise, appears to have ignored it. The fact that The Relocation Group neither strictly nor substantially complied with subsection (b)(4) of Section 20–325a makes readily evident that the Panel in fact improperly applied the statute, which led to the erroneous grant of an arbitral award to The Relocation Group.[10] This notion is reinforced by

---

10. This memorandum concedes that all of the support for this proposition comes from

Sotheby's general counsel, who represented the company at the arbitration. The Reloca-

the Connecticut Supreme Court's decision in *Location Realty,* 287 Conn. 706, 949 A.2d 1189, which stressed that subsections (a) through (c) of Section 20–325a "specifically provide[d] that '[n]o person,' whether licensed or unlicensed, 'shall commence or bring *any* action' to recover for acts done or services rendered absent certain preconditions." *Id.* at 724, 949 A.2d 1189 (second alteration in original) (quoting Conn. Gen.Stat. § 20–325a(a-c)). Nothing in *Location Realty's* language operates to cabin the breadth of the word "any" found within the aforementioned provisions, so it must be presumed that commission-recovery claims brought under any theory (including procuring cause) must nonetheless satisfy the statute's requirements.

The only question remaining, then, is whether the Panel knew of Section 20–325a's existence and its applicability to the matter between Sotheby's and The Relocation Group. Knowledge of the governing law on the part of an arbitrator is not to be assumed; rather, the Second Circuit has observed that the party seeking vacatur of an arbitral award must "communicate— either by written submission or orally—to the arbitrators that the [governing law] mandated … an award [in her favor]." *DiRussa v. Dean Witter Reynolds Inc.,* 121 F.3d 818, 823 (2d Cir.1997) (emphasis omitted). On numerous occasions during the course of the arbitration, Sotheby's counsel and witnesses reminded the Panel of the import of Section 20–325a and the necessity of having a valid buyer representation agreement before one could bring a commission-recovery action under the statute.[11] *See* Aff. Sanoj Stephen Supp. Pet. Vacate/Opp'n Mot. Confirm ¶ 31, ECF No. 28 (relaying The Relocation Group's bungled response to a question regarding why

The Relocation Group failed to obtain a second extension of its authorization); *id.* ¶ 32 (relaying an explanation made by one of the witnesses for Sotheby's that, in Connecticut, a buyer representation agreement is a "prerequisite" for a procuring-cause claim); *id.* ¶ 33 (relaying Sotheby's closing argument, in which the company's general counsel stated, *inter alia,* the following: "We have the benefit of a state legislature tying a nice little bow around procuring cause for us. In order to bring a procuring cause claim, you've got to have a written agreement that actually entitles you to compensation and meets the requirements of 20–325a…. [T]he controlling case law is *Location Realty versus Colaccino* …. [The Connecticut Supreme Court] ruled that the words 'any action' in the statute really means any action under any theory whether that be … procuring cause.") (last alteration original). Sotheby's has proffered to the Court evidence sufficient to demonstrate that the Panel was subjectively aware of Section 20–325a and its relevance to the instant dispute. It is apparent, therefore, that the Panel's decision to grant an arbitral award in favor of The Relocation Group was in manifest disregard of the law.

## III. CONCLUSION

For the foregoing reasons, this Court GRANTS Sotheby's verified petition to vacate the Panel's arbitration award, ECF No. 1, and DENIES The Relocation Group's cross-motion to confirm the arbitration award, ECF No. 17.

**SO ORDERED.**

---

tion Group has not contested the accuracy of the general counsel's account, however, so the Court accepts its veracity without reservation.

11. Of the District of Massachusetts, sitting by designation. *See* Order Transfer, Jan. 10, 2013, ECF No. 36.